**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 25 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

    No. 00-5024

BRUCE M. BERGER,

    Defendant-Appellant.

---

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 98-CR-85-BU)**

---

John E. Dowdell, of Norman, Wohlgemuth, Chandler & Dowdell, Tulsa, Oklahoma, for Defendant-Appellant.

Kenneth P. Snoke, Assistant United States Attorney (Stephen C. Lewis, United States Attorney, with him on the brief), Tulsa, Oklahoma, for Plaintiff-Appellee.

---

Before **LUCERO**, Circuit Judge, **McKAY**, Senior Circuit Judge, and **BROWN**, Senior District Judge.[*]

---

[*]The Honorable Wesley E. Brown, Senior District Judge, United States District Court for the District of Kansas, sitting by designation.

**BROWN**, Senior District Judge.

Appellant Bruce Berger pled guilty to one count of conspiracy to commit mail fraud and one count of mail fraud, in violation of 18 U.S.C. §§ 371 & 1341. A few days before he was to be sentenced, he filed a motion to compel the government to move for a "substantial assistance" departure in his favor under the United States Sentencing Guidelines, Section 5K1.1. After hearing arguments from the attorneys, the district court permitted an evidentiary hearing on the issue. At the conclusion of the evidence, the court rejected defendant's contention that the government's refusal to file a 5K1.1 motion was based upon an unconstitutional motive. Berger was then sentenced in accordance with the terms of his plea agreement. The sole issue in this appeal is whether the district court erred in denying defendant's motion to compel the government to file a 5K1.1 motion.

I.

An understanding of appellant's claim requires a rather extensive summary of the facts. In June of 1998, a 25-count indictment was filed in the Northern District of Oklahoma charging four defendants with conspiracy, wire fraud, mail

fraud, and interstate transportation of money obtained by fraud. The conspiracy involved a scheme to defraud a Tulsa, Oklahoma, facility operated by a company known as Hilti, Inc. According to the indictment, three of the four defendants -- Bruce Berger, Ronald Korman, and Kevin Kelleher -- worked out of a Delray Beach, Florida, office selling cleaning supplies under the name of Concord Industries, Inc., and later, Verde Industries, Inc. They allegedly developed a kickback scheme with a Hilti employee, Jerry Gullo (the fourth defendant), under which Gullo would receive cash bribes or gifts from the three and in return would cause Hilti to approve payment of Concorde and Verde invoices for vastly overpriced merchandise or for merchandise that was never delivered to Hilti. Aplt. App. at 22-39. A second superseding indictment later added numerous charges against the three Florida co-defendants for similar acts aimed at two other Tulsa companies. Id. at 70.

The Hilti employee charged in the scheme, Jerry Gullo, pled guilty in August of 1998 to the Hilti conspiracy charge. In Gullo's plea agreement, which noted that restitution was mandatory for the offense, the parties stipulated that the amount of restitution owed to Hilti "jointly and severally by the defendants in this case" was over $440,000, although it added that Gullo "received far less [than this]

3

as his share [of proceeds from the offense]."[1] Aplt. App. at 60. The agreement also stated: "Based on the defendant's cooperation to date, the United States will, at the time of sentencing, move for a downward departure pursuant to U.S.S.G. § 5K1.1." Id. at 62.

Counsel for co-defendant Kevin Kelleher contacted prosecutors and expressed his client's willingness to cooperate with the government, and on December 3, 1998, Kelleher was debriefed by FBI agents in the Southern District of Florida. Shortly thereafter, Kelleher and Assistant United States Attorney ("AUSA") Ken Snoke came to a verbal understanding as to the terms of a plea agreement, pursuant to which Kelleher would agree to plead guilty to a felony count in the Second Superseding Indictment and would continue to cooperate, and the government would agree to file a § 5K1.1 motion on his behalf for a downward departure. No written agreement was prepared at that time. See Aplt. App. at 416.

In the latter part of December, 1998, and early January, 1999, prosecutors had plea negotiations with attorneys for appellant Berger and co-defendant

---

[1]Section 3664(h) of Title 18 provides: "If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant."

4

Korman, and on January 6, 1999, they met to finalize plea agreements. During these discussions, defense counsel informed prosecutors that Berger and Korman were negotiating an agreement with Hilti for the payment of restitution to Hilti. See Aplt. App. at 618-19. They also indicated that their clients had information they were willing to provide relating to other possible offenses. Id. at 592. They inquired into the type of deal Kelleher was getting, and AUSA Snoke said that although it was not yet in writing and he could not give them all the specifics, Kelleher's deal was similar to the one Gullo received. Id. at 620. Snoke informed them he would be filing a 5K1.1 motion for Kelleher. Id.

Berger and Korman entered guilty pleas at a hearing on January 7, 1998. Berger pled guilty to the Hilti conspiracy count and a related count of mail fraud. His plea agreement was entered into pursuant to Rule 11(e)(1)(C) of the Federal Rules of Criminal Procedure, and called for the following agreed-upon sentence: "[T]he parties agree that a specific sentence of 18 months imprisonment plus a three year term of supervised release, a $200 Special Monetary Assessment, and restitution to Hilti, Inc. in the amount of $430,000 (jointly and severally with other convicted co-defendants), is the appropriate disposition of this case." Based upon the representations of defense counsel that their clients had information they were willing to share about other offenses, the following provision was inserted into the

5

plea agreement: "There has been information provided to this United States Attorney's Office this week, by counsel for defendant, which may, at some future time, result in a post-conviction motion by the United States to reduce the defendant's sentence." Korman's agreement was similar except that it called for a fifteen-month imprisonment sentence. In the course of the plea hearing, the court asked if the government could void the plea agreement if the defendants failed to make the restitution payments. In responding to that question, John Dowdell, who was Mr. Berger's attorney, mentioned his understanding that "there would be a joint and [several] restitution obligation on behalf of Mr. Berger and the other three gentlemen that have been involved in this," and also indicated there had been significant discussions with Hilti and that "there will be an independent agreement, a civil agreement with Hilti" concerning restitution.

The following day, January 8, 1999, Kelleher appeared for his change of plea hearing. Due to an ice storm in the Tulsa area that day, AUSA Snoke, who had primary responsibility for the case, was unable to attend the hearing. As a result, AUSA Doug Horn, who had also worked on the case, covered the plea hearing.

Kelleher's plea agreement provided that he would plead guilty to one mail fraud count relating to the Gunnebo-Johnson Company, which was one of the

6

other Tulsa victims allegedly defrauded by Korman, Berger, and Kelleher. The agreement also provided that "[b]ased on the defendant's cooperation to date, and his continued cooperation in this case in the investigation of Verde Industries in Florida, the United States will, at the time of sentencing, move for a downward departure, pursuant to U.S.S.G. § 5K1.1, to a net offense level of 8." As opposed to Hilti, which had been defrauded out of more than $400,000, Gunnebo-Johnson lost less than $10,000 as a result of the defendants' conduct. Insofar as restitution was concerned, Kelleher's plea agreement contained no specific figure. It stated simply that "[t]he Court can order the defendant to pay for the full loss caused by his conduct set forth above. The defendant agrees that the Court's consideration of the amount of restitution shall NOT be limited to the amounts alleged in the counts to which the defendant is pleading guilty, and may include stipulated amounts as set forth below pursuant to Title 18, U.S.C. § 3663. The defendant further agrees that any amount ordered by the Court to be paid as restitution may not be discharged, in whole or in part, in any bankruptcy proceeding." Apparently before the plea hearing began, counsel for Kelleher approached AUSA Horn and expressed concern over the restitution provision, saying it was his understanding that Kelleher would only have to make restitution to Gunnebo-Johnson. At some point, Mr. Horn called AUSA Snoke about the restitution question, and asked him

7

about the possibility of a stipulation that Kelleher would only be liable for the Gunnebo-Johnson restitution. According to Mr. Snoke, he authorized such a stipulation for several reasons, including the fact that he thought the issue was immaterial because Berger and Korman had indicated they were going to repay Hilti and because Kelleher had no ability to make restitution. Id. at 419. Mr. Horn apparently viewed this as a "fall back" position, however, as he informed Kelleher's counsel that his view was that the restitution requirement applied to the entire scheme. See Id. at 131.

In the course of the plea hearing on January 8th, counsel for Kelleher raised the restitution problem with the court and asserted that Kelleher should only be liable for the Gunnebo-Johnson restitution. He argued that Kelleher had nothing to do with the Hilti scheme. The district court noted that the plea agreement said the court could order the defendant to pay restitution for the full loss caused by his conduct, and asked Mr. Horn what that meant. Horn said that although Mr. Snoke had apparently believed restitution on Kelleher's part might be limited to the count of conviction (i.e., Gunnebo-Johnson), Horn's understanding of the law was that restitution was not necessarily that limited and could include any loss resulting

from a common scheme or plan, including possibly the Hilti loss.[2] Aplt. App. at

135. He also noted that Kelleher's ability to pay any restitution would be very

limited as compared to Korman and Berger. Id. Horn argued that whether the

Hilti loss resulted from the same scheme or plan as Gunnebo-Johnson was an issue

that should be determined at sentencing. Id. at 136. After further discussion,

however, Horn indicated that although the government's evidence suggested

Kelleher had some involvement in the Hilti scheme, he would be willing to

stipulate that Kelleher would only be liable for the Gunnebo-Johnson loss and that

Hilti would be considered a separate scheme for purposes of restitution. Id. at

137. The district court accepted the stipulation. Later in the plea hearing, Horn

reviewed the provision in the plea agreement relating to the § 5K1.1 motion,

stating that Kelleher "would be entitled to a 5K departure downward for his

---

[2] The permissible scope of restitution has spawned some confusion and considerable case law. In 1990, the Supreme Court held that the Victim and Witness Protection Act, 18 U.S.C. §§ 3663-3364, authorized an award of restitution only for the loss caused by "the specific conduct that is the basis of the offense of conviction." Hughey v. United States, 495 U.S. 411, 413 (1990). A split of authority subsequently developed as to how Hughey applied in mail fraud cases, where a specific mailing is typically alleged to be part of a broader scheme to defraud. Some courts held that a defendant could only be liable for the loss from the specific mailing in the count of conviction. This dispute was subsequently settled by an amendment to the VWPA effective November 29, 1990, which made clear that restitution could be ordered for the broader scheme to defraud alleged in a mail fraud count. See e.g., United States v. Hensley, 91 F.3d 274, 277 (1st Cir. 1996); 18 U.S.C. § 3663A(a)(2).

cooperation providing assistance to the government, not only in statements to the investigating agencies but in making himself available to testify at any potential trials against codefendants." Id. at 152.

The following day a story on Kelleher's plea appeared in the Tulsa World newspaper. Under the headline "'Minor participant' pleads guilty in mail fraud scheme," the article reported that Kelleher had admitted defrauding Gunnebo-Johnson and would be liable for only a small amount of restitution, whereas Korman and Berger had pled guilty and had agreed to pay restitution to Hilti in the amount of $430,000. The article quoted Kelleher's lawyer as saying that his client had no role in the Hilti conspiracy, and quoted AUSA Horn as saying that Kelleher was a minor participant who might get a sentence of probation. John Dowdell, appellant's attorney, received a call from defendant Korman, who had seen the article. According to Dowdell, Berger and Korman were shocked by the terms of Kelleher's plea. Aplt. App. at 622.

On January 27, 1999, co-defendant Jerry Gullo appeared for sentencing. Based on the government's motion pursuant to § 5K1.1, the court departed downward from the guidelines and placed Mr. Gullo on five years' probation and ordered him to pay $446,833.15 in restitution to Hilti "jointly and [severally] with any other person ordered to pay restitution to the victim of this offense."

10

After reading about Kelleher's plea in the newspaper, Mr. Dowdell wrote AUSA Snoke on January 27, 1999, saying he would like to review Kelleher's proffer to the government. Aplt. App. 368. A series of letters followed. Snoke wrote back and declined, stating that Kelleher's lawyer said he had kept Dowdell advised, and suggesting that Berger should "tell his story to probation without the benefit of anyone else's." Id. at 369. Dowdell wrote back, saying he wanted to see the proffer because he believed Kelleher's plea did "not comport with the facts as I have developed them," a reference to his belief that Kelleher had understated his role in the Hilti conspiracy, and "in light of the contrast, to put [it] politely, between the representations made by you to me as to the substance of Kelleher's deal and his actual deal, as well as the government's apparent breach of the explicit terms of Bruce Berger's and Ron Korman's plea agreements." Id. at 370. In a responsive letter, Snoke acknowledged that Dowdell had previously asserted that Kelleher was more involved in Hilti than he had admitted, but noted that Dowdell had also prefaced such assertions by saying he "did not want to get Kelleher into any additional trouble." Snoke suggested that Dowdell share any information he had about Kelleher with the Probation Department, which was conducting a pre-sentence investigation. Snoke also said he had no idea what Dowdell was referring to when he said the government had breached Berger's and Korman's

11

plea agreements and asked Dowdell to explain. Dowdell's response letter did not discuss the alleged breach but suggested a meeting and renewed the request for Kelleher's proffer. This request apparently led to a meeting between Dowdell and Snoke on March 5, 1999, at which Dowdell explained his belief that the government had breached Berger's plea agreement by not holding Kelleher liable for the Hilti restitution. Snoke indicated that he wasn't sure what he could do about it at that point, questioned whether the issue was really material to Berger's plea, and said that Berger's only real option at that point was probably to undo the plea agreement if he so desired. During the meeting, Dowdell described information which he said showed that Kelleher was fully involved in the Hilti scam with Berger and Korman. Snoke said that if the information was accurate it was troubling, and that it might cause him to ask that Kelleher serve some time, but he also said he would not back away from his § 5K1.1 agreement with Kelleher and that he wanted to talk to AUSA Horn about it.

Meanwhile, in February of 1999, defendants Korman and Berger met with an FBI Special Agent and provided information regarding other possible violations of U. S. laws. Berger provided additional information to the FBI in March of 1999.

On April 28, 1999, Kelleher appeared for sentencing. In the course of that

12

hearing, his attorney objected to a portion of the Presentence Report treating the Hilti loss as relevant conduct. Aplt. App. at 181. The Presentence Report said that FBI agents had found evidence of Kelleher's involvement in the Hilti scheme. Kelleher's counsel argued that his client had not intended to defraud anyone. Id. In his response, AUSA Horn expressed concern that defense counsel was minimizing his client's involvement, but said the government was nevertheless moving for a § 5K1.1 downward departure because Kelleher was "very cooperative and instrumental in coming forward early on in the investigation and providing information about the scheme that Verde Industries was involved in in defrauding Hilti and other companies," and "provided several interviews with the FBI agents in Florida and has provided information not only in this case, but potentially in other cases and that may affect the Florida FBI office and that may go beyond that and he has made himself available for interviews and, if necessary, testimony in this and other cases." Aplt. App. 191-92. Horn said Kelleher was a lesser participant as compared to Berger and Korman[3] and recommended a five-level reduction, which would make Kelleher eligible for probation, and he

_____

[3] According to the government, it had evidence showing that Berger was the owner and manager of Verde Industries, that he received the highest compensation of the any of the three Florida defendants, and that he decided who performed what function in the operation of the business. See Aplt. App. at 415.

recommended a sentence of probation. The district court granted the motion and sentenced Kelleher to five years' probation. No restitution was imposed because the victim on the count of conviction, Gunnebo-Johnson, declined to submit a restitution request. The court found that Kelleher did not have the ability to pay a fine.

On April 30, 1999, Dowdell wrote Snoke saying he was surprised to read the press accounts of Kelleher's sentence in light of Snoke's comments at the March 5th meeting that "you were inclined to propose that Kelleher serve time." Dowdell said that despite his offer, no one from the government had conferred with Berger or Korman regarding Kelleher's involvement in the Hilti scheme, although Kelleher was "directly and continually involved" in the Hilti scam. He said that he had "advised you [Snoke] of the general substance of these issues and offered to share more detailed information, but you have shown no interest." Dowdell stated that Berger's and Korman's plea agreements indicated they would be jointly and severally liable to Hilti along with Gullo and Kelleher, and "[t]his was a material representation made by you to [co-counsel] and me, on which our clients relied." Dowdell said that at the March 5th meeting, Snoke had represented that Kelleher did not receive a § 5K1.1 motion based on his cooperation regarding the allegations in the Second Superseding Indictment and, as Dowdell was

unaware of any other investigation initiated as a result of Kelleher's proffer, Dowdell was "mystified as to the basis for the government's moving under § 5K1.1." Dowdell again requested a copy of Kelleher's proffer "so that I might take appropriate remedial action before the court, if necessary."

On June 1, 1999, AUSA Snoke wrote Dowdell a lengthy response. Among other things, Snoke said that to the extent Kelleher's agreement was relevant to Berger, it should be kept in mind that Kelleher came forward first and, furthermore, to the best of Snoke's recollection the principal issue discussed during plea negotiations with Dowdell had been the amount of jail time that Berger and Korman would receive, rather than what sentence Kelleher would get. Snoke noted that he had informed defense counsel during those negotiations that Kelleher would get a § 5K1.1 motion reducing his sentence to a probation-eligible level. As for Dowdell's assertion that he was unaware of any investigation initiated as a result of Kelleher's proffer or cooperation, Snoke said that "is immaterial, since you would not know." With respect to Dowdell's allegations that Kelleher had been equally involved in the Hilti scheme, Snoke said he had passed that information on to the Probation Department and pointed out that Kelleher's Presentence Report included the Hilti matter as relevant conduct in determining his sentencing guideline range. With respect to joint and several liability for the

15

Hilti restitution, Snoke wrote:

> At the time of Kelleher's guilty plea, Judge Burrage requested that Doug Horn and [Kelleher's counsel] come to some sort of agreement on that issue, and adjourned the plea proceedings while they did so. As I discussed with you on March 5, since it was our understanding that Kevin Kelleher had virtually no resources with which to pay Hilti restitution in any case [a fact that was apparently born out by the presentence report done by Probation], it seemed to Doug and me at the time of Kelleher's plea to be as "academic" to have him jointly and severally liable with your client and Mr. Korman for Hilti restitution, as it was to have Jerry Gullo (equally unable to assist with much restitution) jointly and severally liable for the debt to Hilti. Neither Mr. Horn nor I had any idea at the time of Kelleher's plea that that was a concern to your client -- particularly in light of the fact that [Korman's counsel] had told us, all along, that your clients had worked out or were working out with Hilti, an agreement to pay the entire Hilti restitution, and you expected to have that done before their sentencing, if not before the entry of their guilty pleas in the case. We agreed to continuances in the trial date in part to accommodate these plans. It seems that Kelleher's liability to Hilti only became an issue after Kelleher's plea.

Aplt. App. at 378-79. Snoke said there was conflicting evidence and finger-pointing by the co-conspirators as to how much Kelleher had actually benefitted from the Hilti scheme; and, although he had not initially intended to omit Kelleher from the joint and several liability on Hilti, he ultimately approved that change in Kelleher's agreement under the circumstances. Snoke indicated, as he had before,

16

that to the extent Dowdell believed this was a breach of Berger's plea agreement, he should take whatever steps he thought were appropriate. He also suggested, as he had before, that Dowdell bring to the attention of the court his concerns that "perjurious representations" were made to the court about Kelleher's involvement on Hilti. Snoke again declined to provide a copy of Kelleher's proffer, saying he thought the transcripts of the Kelleher proceedings would provide a sufficient basis for Mr. Dowdell to determine if the representations made to the court did not comport with evidence in Dowdell's possession, as Dowdell claimed.

On July 29, 1999, Mr. Dowdell forwarded a letter to Mr. Snoke regarding Berger and Korman's assistance to a private company that had been a victim of the Verde scam. The company indicated that Berger and Korman's assistance was beneficial and had allowed the company to remove the employees involved.

Also on July 29, 1999, an FBI agent in Florida wrote AUSA Snoke, at Snoke's request, to evaluate information that had been provided to the FBI by Berger and Korman. The letter was not particularly favorable and indicated that the information had not produced anything of substantial value to the FBI. Aplt. App. at 429. On August 19, 1999, Mr. Dowdell wrote one of the Florida FBI agents, stating that he had concerns about the accuracy and completeness of the FBI report. Dowdell noted that the FBI letter indicated Berger and Korman had

17

failed to provide certain information but, according to Dowdell, the defendants had in fact provided it. He also asserted that the FBI letter failed to address other information that had been provided by the defendants. He stated it was "inconceivable to me that the report which Mr. Snoke received could be so bland, if not fundamentally misleading, as to the nature of my client's and his co-defendant's assistance," and he asked the agent to consider supplementing the report.

On September 7 and September 20, 1999, Dowdell wrote Snoke regarding additional efforts by the defendants to provide information to the FBI, and recounting Dowdell's discussions with FBI agents about the matter. On September 22, 1999, Snoke wrote back, saying he would discuss these matters with the FBI agents prior to Berger's sentencing hearing the following week. He added, however, "in light of the tenor of previous written communications to [the FBI agent] and me, pleadings filed in the case, and several meetings held with you and [Korman's attorney] on this subject, I believe that further meetings between us, at this late date, would be unproductive."

On September 27, 1999, two days before the date set for Berger's sentencing hearing, Mr. Dowdell filed a motion to compel the government to file a § 5K1 motion for downward departure on behalf of Berger. Co-defendant Korman made

a similar request. The motion stated that given Berger's assistance, "the government's refusal to move for substantial assistance is arbitrary and capricious, made in bad faith and not rationally related to any legitimate government purpose and otherwise breaches the plea agreement." Aplt. App. at 307. It said the government's bad faith was demonstrated by "the stark contrast between the treatment of Kelleher as compared with that of Berger." Id. The motion said the government acknowledged it had breached Berger's plea agreement but "has shrugged its shoulders in the face of its misconduct," and "has taken great umbrage with defense counsel's communications regarding the breach and the accuracy of representations to the court concerning Kelleher's role in the Hilti scheme." It alleged that the government was unable to overcome its hostility toward Berger and his counsel, and that the propriety of a motion to reduce the sentence was clear "especially when [Berger's] assistance is considered in the context of that provided by Mr. Kelleher, who is now on probation." Id. at 308. Mr. Snoke filed a brief in response on September 29, 1999. He asserted that the remedy for the government's alleged breach of the plea agreement, assuming it was a breach, was to permit the defendant to withdraw his plea, but he pointed out that Mr. Dowdell said Berger did not want to do so. As for the information provided to the FBI by Berger and Korman, Snoke provided a lengthy affidavit

19

discussing those matters in detail, and set forth his reasons for concluding that the information did not amount to substantial assistance to the government.

At the sentencing hearing for Berger and Korman on September 29, 1999, the district court took up Berger's motion to compel the government to file a § 5K1 motion. The court first heard arguments from Mr. Dowdell, who asserted that the government acted in bad faith and that its refusal to file a § 5K1 was "motivated by the concerns and disagreements between counsel for the government and counsel for the defendants arising from the government's breach of the restitution provision of the plea agreement." Aplt. App. at 445. Mr. Dowdell discussed his prior conversations with AUSA Snoke about the alleged breach of the restitution provision and the assistance provided by Kelleher and Berger. Dowdell said that in one of his letters he "confirm[ed] that Mr. Snoke, at the March 5th meeting between the two of us, acknowledged to me that Mr. Kelleher's 5K1.1 motion was not made in consideration for his cooperation with the government with regard to the allegations set forth in this case," Id. at 459, and he argued there was no evidence that Kelleher had provided any assistance in any other case. By contrast, he argued, Berger had provided information relating to several possible federal offenses.

In response, Mr. Snoke argued that the alleged breach of the restitution

20

provision was "totally separate" from the 5K1 issue. Snoke stated that at the time of Kelleher's plea, he did not think Kelleher's liability for Hilti restitution was important to Berger and Korman because they had already indicated they were negotiating with Hilti and anticipated making a lump sum payment to reimburse Hilti. Even if the government's action was a material breach of Berger and Korman's "joint and several" restitution provision, Snoke argued, then the remedy was to permit the defendants to withdraw their pleas of guilty, but he pointed out they did not want to do so. As for Kelleher's assistance, Snoke reviewed the history of the case, and noted that FBI agents had wanted early on to secure the cooperation of Kelleher both as a witness in Oklahoma and elsewhere on potential charges arising out of the defendants' Florida operations. He said he talked with FBI agents about the information provided by Berger and Korman, and that the agents indicated most of their information was of little value, with the possible exception of one matter that had not been fully evaluated but which could possibly result in a future investigation. He concluded that the information provided by Berger and Korman did not warrant a 5K1.1 motion, and denied that animosity played any role in his decision. He noted that he had agreed to continuances of the sentencing date to allow Berger and Korman to attempt to provide assistance. He said "the fact that we made agreements with defendant Kelleher and defendant

21

Gullo to cooperate, that it caused, we feel, these defendants [Berger and Korman] to decide to enter pleas in this case. It was definitely a case, like most of them are around here, where you do flip the first person in and you flip whoever else you need to or you think you need to to make your case and make it in the Southern District of Florida, if they want to, and that is why Mr. Gullo and Mr. Kelleher got specific 5K1.1 recommendations in their plea agreements; whereas these defendants did not." Aplt. App. at 488. He added that, "at the time Mr. Kelleher flipped, if you will, and we made the agreement to have him debriefed and make his agreement, it was entirely a different situation than it was later on with these two after we already had Kelleher on our side." Id. at 488-89.

Mr. Dowdell argued numerous points in response, including an assertion that at the March 5th meeting "we specifically demanded that the joint and several liability to Hilti flow to Mr. Kelleher as well." Aplt. App. at 489. He argued it was unfair to let the government breach the plea agreement and then say that the remedy was to simply have the defendants withdraw their pleas of guilty and thereby subject themselves to a greater sentence. He took issue with Snoke's assertion that Kelleher's cooperation induced Berger and Korman to change their pleas, saying although Kelleher's cooperation "irritated them," it was not a motivating factor in their decision. Id. at 496. In the course of his argument, Mr.

22

Dowdell asked that he be allowed to be sworn to give testimony.

Because of time constraints, the district court was forced to continue the hearing until October 15, 1999. The day before that hearing, Mr. Dowdell submitted two affidavits from former employees of Verde, Inc., who stated Kelleher was aware of or was involved in all of the company's transactions with Hilti. At the resumption of the hearing on October 15th, Assistant U.S. Attorney Kevin Leitch represented the government because Snoke and Horn anticipated being called as witnesses. Mr. Dowdell proceeded first and, with the approval of the district court, called AUSA Snoke to the stand. Mr. Snoke testified in detail about the plea negotiations, the plea agreements, and the reasons for his decisions on behalf of the government. Among other things, Snoke testified that on January 7, 1999, when he negotiated the plea agreements for Berger and Korman, he had not reached a specific agreement with Kelleher as to his responsibility for restitution. He also said he did not recall the "joint and several" aspect of restitution being specifically discussed at the meeting with counsel for Berger and Korman. He said the provision in Berger's and Korman's plea agreements for "joint and several" liability was standard language that he put in for the benefit of the victim and the government, not for the defendants' benefit, and that he probably copied it from Gullo's plea agreement. He explained when AUSA Horn

23

called him during Kelleher's plea hearing and indicated the judge wanted the restitution issue cleared up in Kelleher's agreement and Kelleher's counsel was indicating that the restitution was a "deal breaker," he agreed to let Horn stipulate that Kelleher would not be liable for the Hilti restitution because it was his understanding Kelleher had no resources and could not make restitution anyway. Snoke testified it did not occur to him at the time that this might be a breach of Berger's and Korman's agreements. He said he still did not believe the government had breached those agreements because the "joint and several" provision was for the victim's benefit but added that, if it was a breach, it was unintentional. Snoke conceded none of the charges in the Second Superseding Indictment were brought based on information provided by Kelleher, and he did not know whether the information provided by Kelleher led to the opening of an investigation or prosecution against anyone. Snoke also conceded the first time he had told Dowdell that Kelleher was going to get a 5K1 motion was at the meeting on January 6, 1999, the day before Berger and Korman pled guilty. With regard to information provided to the FBI by Berger, Snoke testified a recent check with the FBI indicated they would not be opening an investigation into the one matter that they previously indicated might be of some interest, and both he and the FBI agent were of the opinion that Berger's and Korman's information did not amount to

24

substantial assistance to the government. Aplt. App. at 569-70; 598. The FBI agent was present at the evidentiary hearing but due to certain stipulations was not called as a witness. Aplt. App. at 514; 613. Snoke denied his decision was based on personal animosity and denied that he retaliated because of the defendants' complaint that he had breached the plea agreement. Snoke denied he had told Dowdell at the March 5th meeting Kelleher did not receive a 5K1 motion for his cooperation on the instant case. Id. at 604-05.

Mr. Dowdell next called his client, Bruce Berger, to testify at the hearing. Among other things, Berger said the "joint and several" restitution provision in his plea agreement was important "because we were all equally involved," and at the time of his plea he understood that Kelleher would be pleading guilty to the Hilti conspiracy and would be liable for that restitution.

Mr. Dowdell was called as the next witness. He was examined by Mr. Stidham, the lawyer for co-defendant Korman. Among other things, Dowdell said the first time he learned Kelleher would be getting a 5K1 motion was at the January 6, 1999, meeting with Snoke, and Snoke told him Kelleher would be pleading to something similar to Gullo's plea. Dowdell understood this to mean Kelleher would be pleading to the Hilti conspiracy count. Dowdell said "we explicitly discussed the joint and several liability issue as to Hilti and were told

[by Snoke] that that would not be -- that would be included in our plea agreement and that was not a problem." Aplt. App. at 620. Dowdell then recounted the subsequent correspondence between himself and Snoke in which he expressed concern that representations were being made to the court that Kelleher was not involved in the Hilti scheme, when in fact he was. Dowdell indicated his client was adamant that Kelleher share in the Hilti restitution because, according to Berger, Kelleher was equally involved in the scheme. Id. at 627. Dowdell said he had never represented to the government Berger and Korman were willing to shoulder the entire burden of the Hilti restitution. Id.

After Mr. Dowdell's testimony, the government called AUSA Doug Horn to testify as to his recollection of events, and the government then recalled Mr. Snoke. Snoke said he did not give Kelleher's proffer to Mr. Dowdell because he did not think it was relevant to the arguments being made by Dowdell. Snoke recounted that at the March 5th meeting, when the government's alleged breach of the plea agreement was discussed, Dowdell told him that what he really wanted was a 5K1 motion for Berger. According to Snoke, he responded by saying the alleged breach and the 5K1 motion were two separate issues and he would not do anything different on the 5K1 because of the alleged breach. Aplt. App. at 645-46. Snoke went into more detail on his reasons for giving Kelleher a 5K1 motion, and

26

said Kelleher had been targeted early on for cooperation because the government did not have strong evidence against him. Assuming he would be willing to testify, they had planned to use his testimony against Berger and Korman in the Oklahoma investigation and to use him to decipher some 30 boxes of records relating to further possible charges in the Southern District of Florida. Snoke said Kelleher's lawyer called him early on and indicated they wanted to work out a deal and did not want to go to trial. They worked out a tentative agreement in November of 1999, and Kelleher gave his proffer in early December. Snoke said he did not think the government needed Kelleher to a great extent in the Oklahoma case (already having Gullo's cooperation at that point); but, after reading his proffer and securing Kelleher's promise to be a witness in the Oklahoma case and in any prospective case in Florida, and in view of the fact that as far as he knew Berger and Korman were planning on going to trial, he made the decision to give Kelleher a 5K1.1 motion.

At the conclusion of the October 15, 1999, hearing, the judge took the matter under advisement. The parties filed additional briefs in November of 1999, and the sentencing hearing was resumed on January 26, 2000. At that hearing, the district court first discussed the alleged breach of Berger's and Korman's plea agreements. The court expressed doubt as to whether a plea agreement for one

27

defendant could dictate joint and several liability for other defendants. Aplt. App. at 202. The judge nevertheless said the government "probably" breached this provision of the plea agreements, although he said he did not think the breach was intentional. Id. The remedy, the court said, was to allow the defendants to back out of the agreements and to withdraw their pleas of guilty if they wanted to do so. Id. Both of the defendants, upon inquiry from the court, said they did not want to do so. Id. at 205. The district court then discussed the case law dealing with § 5K1.1 challenges, including Wade v. United States, 504 U.S. 181 (1992) and United States v. Lee, 989 F.2d 377 (10th Cir. 1993). It noted that in Lee, the Tenth Circuit said the district court can review the government's refusal to file a 5K1.1 motion only if the refusal violates an agreement with the government, if the refusal is based on an unconstitutional motive, or in an "egregious case." The district court then concluded that none of these factors were present in the instant case and denied the defendants' motion. Aplt. App. at 208-09. The district court proceeded to sentence Berger and Korman in accordance with their plea agreements.

## II.

On appeal, Berger argues that the district court erred in denying his motion because the government's refusal to file a 5K1.1 request was based on an unconstitutional motive. He contends the prosecutor's refusal violated his right to

28

due process because it "was not rationally related to any legitimate government end" and was motivated by retaliation for his assertion that the government breached its promise concerning restitution. Next, he argues the refusal to file the motion violated his plea agreement because the government "failed to exercise its discretion in good faith." Aplt. Br. at 43. Finally, he contends the prosecutor's refusal to file a 5K1 motion is "egregious" when the assistance he rendered is compared to that given by Kelleher.

III.

During oral arguments in this case, the panel asked counsel whether it was appropriate for attorneys who had testified as witnesses in the district court to argue the case on appeal. This concern was raised in light of standards such as Rule 3.7 of the Rules of Professional Conduct, adopted by the Oklahoma Supreme Court. See 5 O.S. 2000, Ch. 1, App. 3-A. That rule provides -- with certain exceptions -- "a lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness." Comments to the identical ABA rule indicate the rule "is not by its terms applicable to service as appellate counsel." See, ABA Model Rule 3.7, Comment (1999). Although the rule thus does not appear to bar counsel's representation in the instant appeal, we note the dual roles of the attorneys in this case have made the determination of the appeal more difficult.

One of the reasons for Rule 3.7 is that "[a] witness is required to testify on the basis of personal knowledge, while an advocate is expected to explain and comment on evidence given by others. It may not be clear whether a statement by an advocate-witness should be taken as proof or as an analysis of the proof." See 5 O.S. 2000, Ch. 1, App. 3-A, Rule 3.7 (comment). We found this to be true with respect to the oral arguments of counsel, which made us uncertain at times whether the attorneys were offering an analysis of the record or were instead supplementing the record by expounding on facts within their personal knowledge. In such circumstances, we think attorneys should consider whether it would be wiser to have different counsel handle the appeal, so as to keep separate the roles of attorney and witness, to preserve the ability of counsel to remain objective, and to avoid any potential conflict of interest between the attorney and the client.

IV.

Section 5K1.1 of the U. S. Sentencing Guidelines provides in part that "[u]pon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." USSG § 5K1.1 (Nov. 1998). In Wade v. United States, 504 U.S. 181 (1992), the Supreme Court addressed a challenge to the government's refusal to file a 5K1.1 motion.

30

After noting the government made no agreement in that case requiring it to file the motion, the Court said § 5K1.1 gives the government the power, but not a duty, to file such a motion when a defendant has substantially assisted. Like other prosecutorial decisions, a federal district court may review a prosecutor's refusal to file a 5K1.1 motion if the court finds the refusal "was based on an unconstitutional motive" such as the defendant's race or religion, or if the "prosecutor's refusal to move was not rationally related to any legitimate Government end...." Id. at 186-87. A mere claim that a defendant provided substantial assistance, however, will not entitle a defendant to a remedy or even to discovery or an evidentiary hearing,[4] nor will generalized allegations of improper motive suffice. Id. See also United States v. Courtois, 131 F.3d 937, 938-39 (10th Cir. 1997) (prosecutor's discretionary refusal to move for downward departure is not reviewable absent unconstitutional motive or lack of rational relationship to legitimate government end).

In cases both before and after Wade, the Tenth Circuit suggested in addition to the foregoing reasons, a district court could also grant relief "in an egregious

---

[4]A defendant has no right to discovery or an evidentiary hearing unless he makes "a substantial threshold showing." Wade, 504 U.S. at 186. No issue has been raised here concerning the district court's decision to permit an evidentiary hearing. Consequently, we express no opinion on whether that determination was appropriate.

31

case ... where the prosecutor stubbornly refuses to file a motion despite overwhelming evidence that the accused's assistance has been so substantial as to cry out for meaningful relief." See United States v. Lee, 989 F.2d 377, 379-80 (10th Cir. 1993) (citing United States v. Kuntz, 908 F.2d 655, 657 (10th Cir. 1990)). After oral arguments in the instant case, a panel of the Tenth Circuit determined this "egregious case" exception was no longer good law in view of Wade. See United States v. Duncan, 242 F.3d 940 (10th Cir. , 2001). Accordingly, to the extent appellant relies upon this exception in his case, we find it provides no grounds for relief. Our discussion is consequently limited to the grounds for relief suggested in Wade.

## V.

Appellant alleged the government's refusal to file a § 5K1.1 motion on his behalf was based on an unconstitutional motive, as shown by "the stark contrast between the treatment of Kelleher as compared with that of Berger." Aplt. App. at 307. The district court's finding that the prosecutor's refusal was not based upon an unconstitutional motive is a finding of fact we will reverse only if it is clearly erroneous. See e.g., United States v. Hawley, 93 F.3d 682, 686-87 (10th Cir. 1996) (applying general rule that clearly erroneous standard governs findings of fact). We conclude the district court's finding is supported by substantial evidence in the

record. In explaining why Kelleher was granted a § 5K1.1 motion while Berger and Korman were not, Snoke said he believed the early cooperation of Gullo and Kelleher caused Berger and Korman to decide to plead guilty. Aplt. App. at 488. He explained that insofar as the government knew when Kelleher offered to cooperate, Berger and Korman were planning on going to trial. In such circumstances, Kelleher's cooperation and his value as a potential witness were of obvious benefit to the government. From the government's perspective, when Berger and Korman were faced with the prospect of two cooperating witnesses willing to testify against them, they were certain to encounter significant pressure to admit their guilt and to obtain the benefit of a plea agreement. That is in fact ultimately what they decided to do.[5] If they had maintained their plea of not guilty, Kelleher would have been available as a witness against them. Under the circumstances, Snoke had a rational basis for considering Kelleher's cooperation to be a substantial benefit to the government in the prosecution of Berger and

---

[5] Berger argues that Kelleher's cooperation had no impact on his decision to plead guilty, and says he did not even learn of the government's intention to file a 5K1 motion for Kelleher until after Berger's plea agreement had been worked out. Aplt. Br. at 24. Regardless of the specific factors that went through appellant's mind, however, the salient point is that the government had a tangible and rational basis for deeming Kelleher's cooperation to be of substantial assistance in the prosecution of its case. The prosecutor could properly conclude that his assistance was valuable because it would encourage Berger to plead guilty or, if Berger decided to go to trial, because Kelleher would be available as a witness.

33

Korman. Kelleher's situation was thus clearly distinguishable from Berger and Korman, whose willingness to cooperate came too late to assist the government in the instant case. See Aplt. App. at 488 ("[A]t the point we made these plea agreements with [Berger and Korman], the case was basically over."). See also United States v. Maddox, 48 F.3d 791, 797 (4th Cir. 1995) (prosecutor's offer of a 5K1.1 motion was rationally related to government ends where it was designed to reward the first defendant to come forward as opposed to the defendant who offered the most or the best assistance).

Appellant's attempts to undermine the prosecutor's explanation were unavailing. Mr. Dowdell alleged Snoke said at their March 5, 1999, meeting that Kelleher did not receive the 5K1 motion for his assistance in this case. As an initial matter, this allegation overlooked the undisputed evidence that Kelleher had also agreed to cooperate on potential charges against the defendants (and others), if the need arose, in Florida. At any rate, Snoke denied having made this statement, see Aplt. App. at 604-05, and explained to the district court Kelleher's willingness to cooperate both in this case and in other potential cases was the reason he gave Kelleher the motion. In guaranteeing Kelleher a 5K1 motion that made him eligible for probation, Snoke gave Kelleher the same benefit he had given Gullo, the first defendant to come forward. Snoke's explanation was

34

consistent with the prior representations of AUSA Horn, who had informed the district court on the day of Kelleher's plea in January of 1999 that Kelleher was receiving the 5K1 motion because of his willingness to provide information and to be a witness in the instant case and other potential cases. Horn gave the same explanation at Kelleher's sentencing in April of 1999. Under the circumstances, the district court had ample basis to conclude that the government's decision to give Kelleher a 5K1 motion was related to legitimate government interests in rewarding assistance in the prosecution of others. Cf. Town of Newton v. Rumery, 480 U.S. 386, 396 (1987) (broad discretion in charging decisions appropriate because prosecutor, not courts, must evaluate the strength of a case, the allocation of resources, and enforcement priorities).

In contrast to the discernible value of Kelleher's cooperation, the record is void of evidence that the information provided by Berger and Korman was of substantial assistance to the government. In addition to Snoke's assessment to that effect, the record indicates that the FBI agents involved in the investigation shared his view. These assessments were bolstered by evidence that, notwithstanding appellant's apparent good faith attempts to provide all of the information he had, none of that information in fact assisted in the prosecution of other individuals. Without setting forth the specific details of this information and the reasons why it

35

was insufficient, we simply note Snoke's affidavit, representations and testimony provided a substantial -- if not uncontroverted -- basis upon which the district court could properly conclude the proffered information did not qualify as substantial assistance. See Aplt. App. at 420-21; 424-26.

Appellant nevertheless claims the prosecutor's refusal to grant him a 5K1.1 motion was prompted by a retaliatory motive because Berger had previously accused the government of breaching the plea agreement. The district court obviously rejected this argument, and we cannot say its determination is clearly erroneous. The claim that these two events were causally related appears to be based primarily on the fact that one came after the other -- post hoc, ergo propter hoc. Although we do not question defense counsel's sincerity in raising and pursuing the alleged breach of the plea agreement, the attempt to cast it as the cause of subsequent events is unsubstantiated. Even assuming that the government's failure to hold Kelleher liable was a breach of Berger's plea agreement,[6] the appropriate remedy under the circumstances was -- as the

---

[6] Like other aspects of restitution, "joint and several" liability has spawned some confusion. See e.g., United States v. Arutunoff, 1 F.3d 1112, 1121 (10th Cir. 1993). Although we assume for purposes of our ruling that the government breached Berger's plea agreement, we cannot agree with appellant's suggestion that the language of the agreement was entirely clear. If the agreement was intended to guarantee Berger that the government would seek Hilti restitution from Kelleher and that Kelleher would in fact be ordered to pay such restitution, it certainly did so in a

prosecutor suggested and the district court found -- to give Berger an opportunity to withdraw from the agreement.[7] Berger and Korman both declined to do that. Although the prosecutor clearly did not handle this matter in ideal fashion and failed to communicate properly with defense counsel about the matter, the district court found that any breach on the government's part was unintentional. As the court noted in assessing the significance of the issue, the "practical side" was the fact that Kelleher had "a negative net worth of almost $100,000.00 and virtually no assets." Aplt. App. at 202. It was apparently because of this, and perhaps due to a misunderstanding of the law, that Snoke viewed the matter as immaterial and agreed to let Kelleher off the hook for the Hilti restitution. Although that may

roundabout way. Berger's agreement contained a section entitled "Defendant's Obligations," which noted that restitution was mandatory and that the court could order the defendant to pay the full amount. The next section, entitled "The Government's Obligations," said nothing at all about restitution. The last section of the agreement, entitled "Sentence," contained the agreed upon sentence pursuant to Rule 11(e)(1)(C), which included "restitution to Hilti, Inc. in the amount of $430,000 (jointly and severally with other convicted co-defendants) ...." Aplt. App. at 105-110.

[7] The plea agreements specifically provided: "In the event either party believes the other has failed to fulfill any obligations under this agreement, then the complaining party shall, in its discretion, have the option of petitioning the Court to be relieved of its obligations herein." Aplt. App. at 322. Specific performance of the government's alleged promise was not an option in this case given that a plea agreement had already been concluded with Kelleher which did not obligate him to pay Hilti restitution. Any change in Kelleher's obligations at that point would have been a breach of his agreement.

have been contrary to appellant's legitimate expectations at the time he entered his plea agreement, from a practical standpoint it is difficult to see how it caused appellant real prejudice. In view of Kelleher's financial situation it is highly unlikely that any obligation on his part to make Hilti restitution would have been benefitted Berger and Korman.[8] At any rate, when Berger and Korman claimed the government's action was a breach of their plea agreements, the prosecutor pointed out that he could not retroactively change Kelleher's deal and suggested that the appropriate remedy, assuming it was a breach, was for Berger and Korman to petition the court to withdraw their pleas of guilty if they wanted to do so. We see nothing inappropriate in this response, and we reject appellant's suggestion that it shows the prosecutor harbored an irrational hostility to the defendant or his

---

[8] Although it is true that any restitution payments made by Kelleher to Hilti would have reduced appellant's outstanding restitution obligation, the fact is that Kelleher had no assets and was deep in debt. Appellant nevertheless claims that the government's action has prejudiced him in a civil action brought by Hilti, because Hilti used the criminal restitution order to obtain a default judgment against him but not against Kelleher. Aplt. Br. at 15, n. 3. The fact that Kelleher was not subject to the criminal restitution order, however, does not bar Hilti from obtaining a civil judgment against him. Moreover, it only stands to reason that because Berger has substantial assets while Kelleher does not, Hilti will pursue recovery from Berger instead of Kelleher. That would likely be true regardless of any judgment Hilti might obtain against Kelleher. Such recovery would be in keeping with joint and several liability, which - assuming it applies in the civil case - would permit Hilti to obtain recovery from any or all of the joint tortfeasors for the entire injury. See 1 Dan B. Dobbs, The Law of Torts § 170 (West 2001).

38

counsel.  Likewise, the fact that the prosecutor informed the defendants that if they withdrew from their plea agreements they would lose the benefit of the agreed-upon prison terms does not give rise to an inference of vindictiveness or improper motive.  See Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978) (threat to re-indict defendant on more serious charge if he did not plead guilty was not impermissible).

The correspondence and conduct of both attorneys in this case reflect an advocacy of conflicting interests on behalf of their clients, as well as some of the give-and-take inherent in plea negotiations.  There obviously could have been better communication on both sides.  But after hearing extensive testimony from the attorneys about the reasons for their actions, the district court found Snoke's 5K1 decision was not based on an unconstitutional motive.  The record provides ample support for that ruling.  As we noted previously, the prosecutor's explanation was supported by legitimate and rational bases appearing in the record.  We see nothing to link Snoke's decision on the 5K1 motion to Berger's claim the government breached the plea agreement.  We note, as the district court undoubtedly did, even after the defendants claimed that the prosecutor had breached their plea agreements, the prosecutor agreed to defense requests to continue the sentencing date in order to give the defendants an opportunity to

provide substantial assistance. In sum, the record does not show the prosecutor abandoned his duty to make a decision based on governmental interests rather than personal ones. Cf. United States v. Murphy, 65 F.3d 758, 762-63 (9th Cir. 1995) (defendant failed to present sufficient evidence to demonstrate prosecutorial vindictiveness). Appellant simply failed to persuade the district court the prosecutor's determination was based on anything other than an assessment of legitimate governmental interests.

Appellant's final contention is that the prosecutor's refusal to file a 5K1 motion breached the plea agreement -- specifically, the provision stating that information supplied by his attorney "may, at some future time, result in a post-conviction motion by the United States to reduce the defendant's sentence." Appellant concedes that this language made the filing of a motion discretionary with the government. See Aplt. Rep. Br. at 20. He argues, however, the government "failed to exercise its discretion in good faith." Given that the agreement preserved the government's discretion as to whether or not to file a 5K1.1 motion, we think appellant's argument is simply a restatement of his earlier claim that the prosecutor's refusal was based on an unconstitutional motive or was not related to a legitimate government end. As such, it fails for the reasons previously stated. Cf. United States v. Duncan, 242 F.3d 940 (10th Cir. 2001)

40

(where motion is discretionary with the government, the court's authority to review the government's refusal is limited to the two bases set forth in <u>Wade</u>).

## VI.

The judgment of the district court is AFFIRMED.