**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 7 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

RANDY C. KIMLER,

Defendant - Appellant.

No. 02-3097

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 01-CR-10080-WEB)**

---

Timothy J. Henry, Assistant Federal Public Defender (David J. Phillips, Federal Public Defender, Wichita, Kansas, with him on the briefs), for Defendant - Appellant.

Alan G. Metzger, Assistant United States Attorney, Wichita, Kansas (Eric F. Melgren, United States Attorney, Topeka, Kansas, and Brent I. Anderson, Assistant United States Attorney, Wichita, Kansas, on the brief), for Plaintiff - Appellee.

---

Before **TACHA**, Chief Judge, and **ANDERSON** and **O'BRIEN**, Circuit Judges.

---

**ANDERSON**, Circuit Judge.

After a jury trial, Randy C. Kimler was convicted of one count of receiving or distributing, by computer, images of minors engaged in sexually explicit conduct in violation of 18 U.S.C. § 2252(a)(2), one count of possession of such images in violation of 18 U.S.C. § 2252(a)(4)(B), and four counts of distribution of such images in violation of 18 U.S.C. § 2252(a)(2). After various adjustments, Kimler was sentenced pursuant to the United States Sentencing Commission, Guidelines Manual (USSG) (2001 ed.), to 87 months' imprisonment and three years of supervised release. Two conditions of his supervised release are that he cooperate in the collection of a DNA sample, as required by 18 U.S.C. § 3583(d), and that he participate in a sex offender treatment program. Kimler appeals his conviction and sentence, including the two described conditions of his supervised release. For the reasons stated below, we affirm.

## BACKGROUND

### I.  Facts

In April 2001, a citizen in Louisiana contacted the Federal Bureau of Investigation ("FBI") regarding an unsolicited email message she had received that appeared to contain child pornography. Agents from the FBI office in Louisiana investigated the email message and determined that it contained an image of a minor engaged in sexually explicit conduct and that the email address

from which the message had originated was registered to Karen Kimler,[1] a resident of Wichita, Kansas. They forwarded this information to the FBI office in Wichita.

Agent Leslie Earl of the Wichita office of the FBI visited the Kimler residence on April 24, 2001. He talked with Karen, her stepson, Eric Kimler, and her husband, Randy Kimler. Earl showed an edited version of the image to Karen and asked if she recognized it. Karen responded that, though she recognized the girl in the image as Samantha Kimler, Randy's daughter from a previous marriage, she had never seen the image nor sent it in an email message. Similarly, Eric said that he had never seen the image and that he did not send it in an email message. Agent Earl did not ask Randy about the image at that time. He did, however, ask Randy to bring his computer to the FBI office the next day and to be prepared to answer questions regarding the email message.

Randy arrived at the FBI office at the appointed hour but did not have his computer. He brought, instead, a packet of images that he said he printed from his computer. Upon examination, Agent Earl believed the images included child pornography. In this initial interview with Agent Earl, Randy identified the

---

[1]Because many of the people involved in this case share the same last name, they will, for the most part, be referred to by their first names throughout this opinion. Randy C. Kimler, the appellant, will be referred to either as Kimler or as Randy, as the need for clarity dictates.

image that had been sent to Louisiana and admitted that he sent it to at least two people he met on the internet. He told Agent Earl that he had used the email addresses registered in his wife's and daughter's names to send out pornographic images. He forwarded them from his wife's account to his daughter's, and then sent them to third parties. He used this method because he did not know how to send attachments using his own email address and he did not want to send the images directly from Karen's email address. However, he denied sending out child pornography. Randy then signed a consent form giving Agent Earl permission to seize and search his computer.

Shortly after the interview, Agent Earl and a partner went to the Kimler home and seized the family computer, which they delivered to an FBI computer forensic examiner, Specialist Loveall. Loveall recovered numerous email messages with images attached. He also found images that were not attached to email messages. Many of the images had been sent and received using a combination of email addresses including: a Hotmail[2] address, me_4_u11, registered to Samantha; a Hotmail address, luckynlove43, registered to Karen; and

---

[2]Hotmail is a free internet based email service offered by Microsoft. See R. Vol. III at 4. Anyone over the age of 13 may open an account without verification of identity or significant monitoring by Microsoft. See id. at 5. In order to send and receive email messages using Hotmail, one must access the Hotmail servers, which are located in Mountain View, California, at www.hotmail.com. See id.

a Hotmail address, Chi-Town-Rebel, registered to Randy. Loveall saved the images and emails to compact discs, which he delivered to Agent Earl. The images found on the Kimlers' computer and Randy's interview with the FBI led to the charges in this case.

The evidence introduced at trial established that every image Kimler received or distributed using his and his family's Hotmail accounts traveled through the Hotmail servers in California and Kimler's internet service provider in Missouri before reaching his computer in Wichita, Kansas. R. Vol. III at 157. En route, the data traveled across state lines, at least some of the way over ordinary phone or cable lines. Id. Even email messages sent from one of Kimler's accounts to another account on his computer traveled across the Kansas state line to his internet service provider located in Kansas City, Missouri, then back over the state line to Kimler's computer in Kansas. Id.

In support of its case, the government introduced into evidence sixty-nine exhibits including emails, emails with attached images, and other images, all retrieved from Kimler's computer, or brought by Kimler to the FBI interview. Those exhibits showed on their faces that images, purportedly proscribed by the statute, were received and distributed over the internet and possessed by way of storage on Kimler's computer. Thus, for example, the government introduced evidence, through Specialist Loveall's testimony, that the Kimlers' computer

contained at least five email messages, with attached images, that had been sent from the United Kingdom. Id. at 133-35; see Trial Exs. 10, 11, 18, 19 and 20. Loveall also testified that he found images attached to email messages that had been sent from the Kimlers' computer to various email addresses. R. Vol. III at 135-40; see Trial Exs. 29-36. Finally, Loveall testified—without objection or challenge on cross-examination—that in his examination of the Kimlers' computer he found additional evidence that many of the images found on the computer had been downloaded from the internet and that images were also being sent from the computer to the internet. R. Vol. III at 141.

Randy's daughter, Samantha, was called as a witness for the government. She testified that she did not send any messages from the Hotmail address registered in her name. She further testified that, while she was living with Randy in 1999, she received two messages with attached images of what appeared to be "little girls" engaged in sexually explicit conduct, at an email address he had established for her. She testified that when she mentioned those email messages to Randy, he directed her to forward them to his email address, which she did. She also testified that on one occasion she saw Randy looking at a picture of a naked young girl on the computer screen.

Neither Randy nor Karen testified at trial. Randy's son, Eric, was called as a defense witness. On direct examination, he testified that in addition to Randy

and himself, nine other individuals had access to the internet at the Kimlers' house, either through the family computer or through WebTV:[3] family members Karen, Samantha, Junior Kimler, and Spring Kimler; Eric's friends, Jeremy, Shane, A.K., and Lee; and his cousin, Jacob Saunstare. However, on cross-examination, Eric testified that he never saw any of those individuals accessing pornography on the internet at his house.[4] More to the point, Eric testified that none of his friends had the passwords to the email accounts that were used to send and receive the images of minors at issue in this case.

Also on direct examination, he admitted that he often looked at pornography on the internet. But on cross-examination he said that he only looked at girls "[f]rom 14 up."[5] Id. at 184. He testified that he was not interested in "really, really young girls." Id. In particular he testified that he did not look

---

[3]The Kimlers at one time accessed the internet through WebTV, a service which allows consumers to access the internet through their television without the need for a stand-alone computer. Later the Kimlers purchased a computer and accessed the internet using Southwestern Bell's Digital Subscriber Line (DSL) service.

[4]Eric's testimony is contradictory on this matter. He testified that his friends would sometimes look at a "couple of pornographic pictures." R. Vol. III at 176. However, he later testified that he had never witnessed anyone going on pornographic sites while accessing the internet at his house. Id. at 204.

[5]Eric gave conflicting testimony on this matter. When he was asked by defense counsel if he looked at images of "people [his] age and possibly a little younger," he responded that he did. R. Vol. III at 181. He later testified, however, that he only liked girls "[f]rom 14 up." Id. at 184. Therefore, it is not clear whether he looked at images of girls slightly younger than his age or not.

for images of girls who appeared to be eight through twelve years old. He further testified that he had neither sent nor received email messages containing pornographic images.

Jacob Saunstare was also called by the defense. He testified that he often accessed the internet at the Kimlers' house, and that he used the Kimlers' internet access to view pornography, occasionally with Randy's help. However, he testified that he never accessed any child pornography. He also testified that he never sent or received child pornography over the internet while at the Kimlers' house. Finally, on cross-examination he acknowledged that he did not have the passwords to any of the Kimlers' email accounts.

Other than Eric, Samantha, and Jacob, none of the other individuals identified by the defense, through Eric, as having access to the Kimlers' internet connection, was called to testify.

At the close of the government's case the court dismissed Counts 8 and 9, two of the date-specific counts of distribution of images of minors engaged in sexually explicit conduct, for lack of supporting evidence. The jury acquitted Kimler of one count of distribution of child pornography (Count 3). Kimler was convicted on the remaining counts of the indictment—one count of receipt or distribution of images of minors engaged in sexually explicit conduct (Count 1); one count of possession of images of minors engaged in sexually explicit conduct

(Count 2); and four counts of distribution of images of minors engaged in sexually explicit conduct (Counts 4, 5, 6 and 7).

At sentencing, the district court found that some of the images depicted adult males engaging in anal or vaginal intercourse with prepubescent minors. The court concluded that, because the conduct in the images would cause the prepubescent children pain and humiliation, these images qualified as depictions of sadistic conduct under USSG §2G2.2(b)(3). Accordingly, the court increased the guideline offense level by four levels. The court also increased the guideline offense level by two levels for possession of images of prepubescent minors.

## II.    Contentions

Kimler raises seven issues on appeal, as follows: (1) Section 2252 is unconstitutional as applied because his activities were solely intrastate and: (a) there was no showing of a substantial effect on interstate commerce; and (b) merely having a connection to the internet does not, by itself, establish the interstate commerce element of the statute; (2) the evidence at trial was insufficient to establish that he was the one receiving, distributing or possessing the child pornography found on the family computer; (3) the evidence presented at trial was insufficient to prove that the images he possessed, received, and distributed depicted real children; (4) the district court erred in enhancing

Kimler's sentence for possession of images of prepubescent children without expert testimony on the matter; (5) the district court erred in enhancing Kimler's sentence for possession of sadistic images because vaginal or anal penetration of a minor alone does not qualify as sadistic conduct, and expert testimony is necessary to justify an enhancement for sadistic conduct; (6) the condition of Kimler's supervised release requiring him to participate in a sex offender treatment program is not reasonably related to the offenses he committed; and, (7) the condition of supervised release requiring him to cooperate in the collection of a sample of his DNA is not reasonably related to his offenses because: his offenses are not qualifying offenses under the DNA Analysis Backlog Elimination Act of 2000 (DNA Act), 42 U.S.C. 14135a, because they did not involve the sexual abuse or exploitation of children; the DNA Act violates the Fourth Amendment's prohibition against unreasonable searches and seizures; and, the DNA Act violates the doctrine of separation of powers.[6]

---

[6]Kimler argued for the first time in a supplemental authority letter pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure that cited only to United States v. Lopez, 514 U.S. 549 (1995), and United States v. Morrison, 529 U.S. 598 (2000), that the DNA Act is an improper exercise of Congress' Commerce Clause powers. This issue was not raised in either his opening brief or his reply brief. We will not address issues not raised in the appellant's opening brief, especially where the arguments are based on authority that was readily available at the time of briefing. See United States v. Bennett, 329 F.3d 769, 778 n. 7 (10th Cir. 2003); United States v. Sandia, 188 F.3d 1215, 1218 n.3 (10th Cir. 1999) (citing State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 984, n. 7 (10th

(continued...)

It is important to note that our review of the contentions relating to Kimler's conviction is significantly constrained by the lack of a full record on appeal. As indicated in the recitation of facts, the core of the government's case resides in the sixty-nine exhibits taken from Kimler's computer and introduced into evidence by the government. Those exhibits show the persons, acts and the interstate transportation of images which form the very basis of this case. Yet, Kimler did not designate a single one of those exhibits for the record on appeal. Furthermore, with respect to his conviction, he does not cite to, discuss, or address his arguments to any specific exhibit. Since the basis for many of his arguments is a claimed insufficiency of the evidence, the fact that a central part of the record is not before us for review is virtually fatal to those contentions. See United States v. Verduzco-Martinez, 186 F.3d 1208, 1215-16 (10th Cir. 1999) (dismissing an appeal to the sufficiency of the evidence where the "majority of the evidence" introduced by the government at trial was not designated by the appellant as part of the record on appeal). And, we have no duty to search through the trial record to find support for an appellant's arguments. United States v. Rodriguez-Aguirre, 108 F.3d 1228, 1237 n.8 (10th Cir. 1997).

---

[6](...continued)
Cir. 1994)); United States v. Jenkins, 904 F.2d 549, 554 n.3 (10th Cir. 1990).

It also bears noting at the outset that Kimler does not dispute the evidence that <u>every</u> transmission from and to his computer necessarily traveled interstate via telephone lines, or that he received images sent via the internet across state lines, including transmissions from the United Kingdom.

Having noted the state of the record on appeal and the limits of Kimler's arguments, we turn now to the arguments themselves.

**DISCUSSION**

**I.      Sufficiency of the Evidence:   Commerce Clause; Proof that Images Stored on Kimler's Computer Came From the Internet**

Kimler makes alternative arguments regarding the images taken from his computer and introduced by the government at trial.  Proceeding on the premise that the activities in question were purely intrastate,[7] Kimler contends that the statute, as applied, is an unconstitutional exercise of the Commerce Clause power because:  (a) there was no evidence that interstate commerce was substantially

---

[7]For example, Kimler argues that the government was unable to identify any of the child victims as residing outside the state of Kansas and therefore we must conclude that his activity was entirely intrastate.  Appellant's Br. at 12, 18. As we make clear below, this argument misses the point.  The residence of the children depicted is not dispositive of the nature of the activity.  Even if all of the children in the pictures happen to reside in the state of Kansas, Kimler's activity would still be interstate if, as the evidence at trial established, he sent and received the images in interstate commerce over the internet.

affected, and (b) the mere fact that he had internet access, without more, cannot satisfy the interstate commerce count of the statute, citing for both propositions, United States v. Lopez, 514 U.S. 549 (1995); United States v. Morrison, 529 U.S. 598 (2000); United States v. Corp, 236 F.3d 325 (6th Cir. 2001); United States v. Rodia, 194 F.3d 465 (3rd Cir. 1999); and United States v. Paredes, 950 F. Supp. 584 (S.D.N.Y. 1996).

Alternatively, he argues that there was insufficient evidence to establish that the images stored on his computer's hard drive were downloaded from the internet. See United States v. Henriques, 234 F.3d 263 (5th Cir. 2000); United States v. Wilson, 182 F.3d 737 (10th Cir. 1999).

When assessing a challenge to the sufficiency of the evidence, "we review the record de novo, viewing the evidence in the light most favorable to the government and asking whether a reasonable jury could find the defendant guilty beyond a reasonable doubt." United States v. Campos, 221 F.3d 1143, 1151 (10th Cir. 2000).

These contentions by Kimler both ignore and misconstrue the evidence in this case. As set out above, there was sufficient direct evidence, even in the abbreviated record before us, that, using his computer, Kimler received and transmitted proscribed images over the internet across state lines via telephone

- 13 -

wires, and that those computer images were the ones stored on his computer's hard drive.

As we have emphasized, Kimler does not address his argument to a single one of the dozens of exhibits introduced in this case, along with testimony, showing actual interstate trafficking in the proscribed images over the internet. Kimler also does not argue that such actual interstate activity is not in interstate commerce, nor could he. See, e.g., United States v. Runyan, 290 F.3d 223, 239 (5th Cir.) (holding that "transmission of photographs by means of the Internet is tantamount to moving photographs across state lines and thus constitutes transportation in interstate commerce"), cert. denied, 123 S. Ct. 137 (2002); United States v. Schaffner, 258 F.3d 675, 679-83 (7th Cir. 2001) (holding that evidence of transport of child pornography across states lines establishes a sufficient nexus to interstate commerce); see also United States v. Kammersell, 196 F.3d 1137, 1138-39 (10th Cir. 1999) (holding that Congress could regulate an instant message that was both sent and received in Utah where there was evidence that en route from the sender to the recipient the message traveled to Virginia over ordinary telephone lines).

Similarly, Kimler does not contest the fact that every transmission from his computer via the internet necessarily crossed state lines. Thus, based on the foregoing, Kimler's Commerce Clause argument is irrelevant and the cases he

cites are likewise inapposite.[8] There was more than sufficient evidence from which the jury could conclude beyond a reasonable doubt that the interstate commerce element of the statute was constitutionally applied.

## II. Sufficiency of the Evidence

Kimler next argues that the evidence was insufficient to support the jury's conclusion that he was the one receiving, distributing, and possessing the images of child pornography, since others had access to his computer. Sufficiency of the evidence is a legal issue that we review de novo, affirming the district court unless no jury, when presented with the evidence introduced at trial together with the reasonable inferences therefrom, could find the defendant guilty beyond a reasonable doubt. Campos, 221 F.3d at 1151.

As indicated above, there was evidence that Kimler not only had access to all of the email accounts at issue in this case, but that he routed material through

---

[8]For example, Kimler relies extensively on the Sixth Circuit's decision in United States v. Corp, 236 F.3d 325 (6th Cir. 2001), for the proposition that "simple use of the computer [is not] enough to meet the jurisdictional element of [2252]." Appellant's Reply Br. at 2; see Appellant's Br. at 11-12, Appellant's Reply Br. at 1-3. Corp does not stand for the proposition for which Kimler cites it; it is also factually unrelated to this case. The defendant in Corp took photographs of his 17-year-old girlfriend engaging in explicit sexual conduct with his 26-year-old wife and kept the images in a photo album in his home. Corp did not involve the use of a computer or the internet, but rather involved purely intrastate conduct.

Karen's and Samantha's accounts because he did not know how to send images directly from his account. Furthermore, though others in his family also had access to some of the relevant email accounts, they testified that they did not send images of child pornography via email. Additionally, the various friends and neighbors who occasionally accessed the internet at the Kimlers' house did not have the passwords to the email accounts used to send and receive the images at issue here. Finally, Kimler received many of the images underlying his conviction at his personal email address. This evidence, which Kimler does not contest, supports the "plausible inference" that Kimler was the one sending, receiving and possessing the images of minors engaged in sexually explicit conduct at issue in this case. See United States v. Taylor, 113 F.3d 1136, 1145 (10th Cir. 1997) (defining standard in joint occupancy and constructive possession cases). Therefore, a reasonable jury could have concluded that Kimler was the one receiving, possessing, and distributing the images of minors engaged in sexually explicit conduct that were found on the family computer.

**III. Does the Supreme Court's Opinion in <u>Ashcroft v. Free Speech Coalition</u> Require Expert Testimony to Establish that Images Depict Real Rather than Computer Generated "Virtual" Children?**

Kimler next contends that the Supreme Court's recent decision in <u>Ashcroft v. Free Speech Coalition</u>, 535 U.S. 234 (2002), requires either direct evidence of the identity of children in the proscribed images or expert testimony that the images depicted are those of real children rather than computer generated "virtual" children. There was no evidence in this case identifying the children depicted in the images that are the subject of the charges against Kimler.[9] Accordingly, the issue is whether <u>Free Speech Coalition</u> laid down a categorical rule of evidence applicable to cases such as this, requiring expert testimony in all instances to prove that proscribed depictions of children are actually those of real rather than virtual children.

Kimler raises this issue for the first time on appeal. However, he contends that the plain error standard of review does not apply, and that the normal sufficiency of the evidence standard should apply because he made a Rule 29 motion to dismiss at trial.

---

[9]Citing repeatedly to Agent Earl's testimony, <u>see</u> R. Vol. III at 82, Kimler argues that the government witness could not "identify the images believed to be child pornography as being actual child victims." Appellant's Br. at 18. The testimony he referred to, however, dealt with whether Agent Earl could identify the individual children depicted, not whether he could identify the images as depicting children.

But, Kimler's motion to dismiss was specifically limited to the interstate commerce issue. R. Vol. II at 139-40; R. Vol. III at 161-63, 239. Where a Rule 29 motion to dismiss has been made on specific grounds, "all grounds not specified in the motion are waived." United States v. Chance, 306 F.3d 356, 369 (6th Cir. 2002); see United States v. Ziddell, 323 F.3d 412, 421 (6th Cir. 2003); United States v. Herrera, 313 F.3d 882, 884 (5th Cir. 2002) (en banc) (per curiam); United States v. Belardo-Quinones, 71 F.3d 941, 945 (1st Cir. 1995); United States v. Dandy, 998 F.2d 1344, 1356-57 (9th Cir. 1993); see also Charles Alan Wright, Federal Practice and Procedure: Criminal 3d § 469 at 321-22 ("[I]f the defendant has asserted specific grounds in the trial court as the basis for a motion for acquittal, he or she cannot assert other grounds on appeal.").

Accordingly, because Kimler is deemed to have waived this issue, we will not address it on appeal "except for a review for plain error resulting in manifest injustice."[10] United States v. Chavez-Marquez, 66 F.3d 259, 261 (10th Cir. 1995); see also United States v. Sherod, 960 F.2d 1075, 1077 (D.C. Cir. 1992); Wright, § 469 at 321. Under this standard, Kimler "must show: (1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects

_____

[10]Although we have noted that "review under the plain error standard . . . and a review of sufficiency of the evidence usually amount to largely the same exercise," United States v. Duran, 133 F.3d 1324, 1335 n.9 (10th Cir. 1998), we believe that the issue presented by this case is best analyzed using the plain error framework. However, we would reach the same conclusion under either standard.

substantial rights. If he satisfies these criteria, this Court may exercise discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Scull, 321 F.3d 1270, 1277 (10th Cir. 2003) (citation and quotation omitted).

In Free Speech Coalition the Supreme Court declared unconstitutional two statutory provisions—neither of which is part of the statutory charges against Kimler—which were enacted as part of the Child Pornography Prevention Act of 1996 (CPPA), Pub. L. 104-208, §§ 121(4)(5), September 30, 1996, 110 Stat. 3009-26. Free Speech Coalition, 535 U.S. at 256, 258. Kimler relies only on the first, 18 U.S.C. § 2256(8)(B). That provision has the effect of criminalizing sexually explicit images that appear to depict minors, but were generated by computer imaging without using any real children.[11] Id. at 241.

This and other circuits have made it clear that the holding in Free Speech Coalition is limited to the constitutionality of §§ 2256(8)(B) and 2256(8)(D)—the CPPA definitions which prohibit possessing and distributing images which were not produced using real children. See United States v. Pearl, 324 F.3d 1210, 1213

---

[11]At the time of Kimler's conviction, § 2256(8) defined child pornography as, "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where . . . (B) such visual depiction is, or appears to be, of a minor engaging in sexually explicit conduct") (emphasis added).

- 19 -

(10th Cir. 2003) (noting that 18 U.S.C. § 2256 contained both constitutional and unconstitutional definitions of "child pornography"), cert. denied, 2003 WL 21184530 (U.S. June 16, 2003) (No. 02-10597); United States v. Kelly, 314 F.3d 908, 911 (7th Cir.), cert. denied, 123 S. Ct. 1923 (2003); United States v. Richardson, 304 F.3d 1061, 1063-64 (11th Cir. 2002), cert. denied, 123 S. Ct. 930 (2003); United States v. Hersh, 297 F.3d 1233, 1254 n.31 (11th Cir. 2002), cert. denied, 123 S. Ct. 1319 (2003); United States v. Bender, 290 F.3d 1279, 1282 n.2 (11th Cir.), cert. denied, 123 S. Ct. 571 (2002).

Despite that fact, Kimler argues that Free Speech Coalition, at least implicitly, also laid down the rule of evidence described above, i.e., the absolute requirement that, absent direct evidence of identity, expert testimony is required to prove that the prohibited images are of real, not virtual, children. He cites no authority for that proposition, and there is no pronouncement in Free Speech Coalition to that effect.

Rather, Kimler points to Congressional Findings cited by the Court in its discussion, that technological advances have made it "possible to create realistic images of children who do not exist." Free Speech Coalition, 535 U.S. at 240. And, he emphasizes representations made by the government to the Court that it has become difficult to meet the burden of proof in cases involving prohibited images because of such technological advances.

What Kimler does not note, however, is direct language by the Court that imaging technology might be good and getting better, but it is implausible to conclude that it has actually arrived at the point of indistinguishability.

> The hypothesis is somewhat implausible. If virtual images were identical to illegal child pornography, the illegal images would be driven from the market by the indistinguishable substitutes. Few pornographers would risk prosecution by abusing real children if fictional, computerized images would suffice.

Id. at 254.

We conclude that Free Speech Coalition, did not establish a broad, categorical requirement that, in every case on the subject, absent direct evidence of identity, an expert must testify that the unlawful image is of a real child. Juries are still capable of distinguishing between real and virtual images; and admissibility remains within the province of the sound discretion of the trial judge. The only two circuits to have considered the issue take the same position. United States v. Deaton, 328 F.3d 454, 455 (8th Cir. 2003) (per curiam) (citing United States v. Vig, 167 F.3d 443, 449-50 (8th Cir. 1999)); United States v. Hall, 312 F.3d 1250, 1260 (11th Cir.), cert. denied, 123 S. Ct. 1646 (2002).

In any event, even if, *arguendo*, a new expert testimony rule was created by Free Speech Coalition, so that there was error in the introduction of evidence in this case, such a rule certainly is not plain, as required by the plain error standard of review. The defects in Kimler's argument are further aggravated by his failure

to designate the pertinent exhibits for us to review, his failure to cite any specific exhibit, and his failure to connect his argument to any specific exhibit. For all the reasons set out above, we conclude that no reversible error occurred by admission of the exhibits in question.

### IV.    Sentence Enhancements

At sentencing the district court imposed multiple increases to the guidelines base offense level applicable to Kimler's offense. Only two of the adjustments are at issue in this appeal: a two-level increase pursuant to USSG §2G2.2(b)(1), because the material involved prepubescent minors; and, a four-level increase pursuant to USSG §2G2.2(b)(3), for materials that portrayed sadistic or masochistic conduct.

Kimler focuses his argument mostly on the latter adjustment, arguing that it was erroneously applied because the pictures in question showed no conduct beyond that already covered by the statutory definitions for the offense of conviction. He also contends that the adjustment is inapplicable here in the absence of a definition of sadism in the guidelines.

Additionally, Kimler argues that neither of the adjustments in question was proper because the government did not produce experts to testify, respectively: (1) that, as to subsection (b)(3), the images depicted the infliction of pain or

violence; and (2) that, as to subsection (b)(1), the images were those of prepubescent children. "We review the district court's interpretation and application of the Sentencing Guidelines *de novo*." United States v. Martinez-Villalva, 232 F.3d 1329, 1332 (10th Cir. 2000).

In support of his first argument, Kimler points to the fact that § 2252 applies to images that depict "sexually explicit conduct" of a minor, defined in § 2256(2) as "sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex." 18 U.S.C. § 2256(2)(A). He contends that the district court applied the enhancement under §2G2.2(b)(3) to that exact same conduct: anal or vaginal penetration of the minors depicted. Thus, he reasons, the result is an unlawful increase in punishment for the same conduct already punished under the statute itself.

We are unpersuaded. The district court's findings are based on facts not specified in § 2256(2). The district court found that some of the images depict anal or vaginal penetration of <u>prepubescent</u> children by <u>adults</u> causing pain and humiliation, stating:

> The court concludes that the some [sic] of the images submitted by the Government are sufficient to qualify for this enhancement, particularly those showing adults engaging in vaginal or anal intercourse with prepubescent minors. The court concludes that one or more such depictions in this case portrays "sadistic conduct" within the meaning of the guideline, in that the depictions include and are intended to portray the infliction of pain and humiliation on

- 23 -

very young minor victims as a means of giving sexual gratification to individuals with pedophilic tendencies.

Mem. and Order at 2, R. Vol. I, tab 46. We agree with those findings and conclusions by the court, and conclude that it did not err in imposing the enhancement.

Kimler next contends that the district court erred in enhancing his sentence for sadism without expert testimony on the matter. Kimler cites no case in support of this argument. To the contrary, the Fifth and Eleventh Circuits have held that expert testimony is not required to justify an enhancement under 2G2.2(b)(3). United States v. Lyckman, 235 F.3d 234, 239 n. 22 (5th Cir. 2000) ("One hardly requires a medical degree to ascertain that vaginal intercourse with an adult male would involve pain, both physical and emotional, for a young girl."); United States v. Caro, 309 F.3d 1348, 1352 (11th Cir. 2002) ("[W]e hold that the district court erred in its interpretation that, in order to support a sadistic conduct enhancement, the government is required to present expert medical testimony."); see also United States v. Delmarle, 99 F.3d 80, 83 (2nd Cir. 1996) (holding that "it was within the court's discretion to conclude that the subjection of a young child to a sexual act that would have to be painful is excessively cruel and hence is sadistic within the meaning of 2G2.2(b)(3)"). We agree with those authorities, and conclude that expert testimony was not required.

Finally, Kimler argues that in order to apply the two-level enhancement under 2G2.2(b)(1), expert testimony was required to prove that the images in question depicted prepubescent children. He cites no case holding that it is error for a district court to determine that an image depicts a prepubescent child without first hearing expert testimony on the matter.

After reviewing selected trial exhibits provided by the government at sentencing, R. Vol. IV at 14-16, 21, the district court overruled Kimler's objection, stating that "[c]ommon knowledge and experience is generally sufficient to identify a minor as prepubescent. Given the images in question, the court concludes that the enhancement is appropriately applied in this case." Mem. and Order at 3, R. Vol. I, tab 46; cf. United States v. Katz, 178 F.3d 368, 373 (5th Cir. 1999) (noting that "whether the age of a model in a child pornography prosecution can be determined by a lay jury without the assistance of expert testimony [] must be determined on a case by case basis"). We agree.

Defense counsel essentially conceded the point, stating at the sentencing hearing that, "the Court would probably be able to [determine whether the images depicted prepubescent children] on its own." R. Vol. IV at 11; see also Katz, 178 F.3d at 373.

The record does contain the few trial exhibits which the government made available to the court at sentencing in support of the adjustment in question.[12]  We have examined those exhibits and have no doubt that some of the images depict children who were so obviously prepubescent that expert testimony would not have been necessary or helpful to the court.  The images themselves provided sufficient evidence of prepubescence to support the sentence enhancement.

## V.     Conditions of Supervised Release

Mr. Kimler also disputes conditions of his supervised release requiring him to cooperate in the collection of a DNA sample and to participate in a sex offender treatment program.  We discuss them in turn.

### A.     Cooperation in the Collection of a DNA Sample

In addition to the standard conditions of supervision applicable to Kimler during the post-incarceration three-year period of his supervised release, the district court imposed twenty special conditions.  The first such condition requires that "[t]he defendant shall cooperate in the collection of DNA, as directed by the probation officer."  J. at 5, R. Vol. I, tab 47.

---

[12]After the opening brief was filed, the government filed a motion to supplement the appellate record with several images, which it selected from the trial exhibits and submitted to the district court at sentencing.  That motion was granted and the exhibits were received under seal as Supp. Vol. I of the record on appeal.

Kimler challenges this condition on the following four grounds, which we review *de novo* because they raise solely legal questions: (1) his offenses are not qualifying offenses under the DNA Analysis Backlog Elimination Act of 2000 (DNA Act), 42 U.S.C. 14135a, because they did not involve the sexual abuse or exploitation of children; (2) this condition of supervised release is not reasonably related to his offenses; (3) the DNA Act violates the Fourth Amendment's prohibition against unreasonable searches and seizures; and (4) the DNA Act is unconstitutional because it violates the doctrine of separation of powers.

18 U.S.C. § 3583(d), as amended by Pub. L. 106-546, § 7(b), Dec. 19, 2000, 114 Stat. 2734, provides in pertinent part as follows:

> **(d) Conditions of supervised release.**— . . . The court shall order, as an explicit condition of supervised release, that the defendant cooperate in the collection of a DNA sample from the defendant, if the collection of such a sample is authorized pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000.

18 U.S.C. § 3583(d) (emphasis added).

In turn, section 3 of the DNA Analysis Backlog Elimination Act of 2000, Pub. L. 106-546, § 3, Dec. 19, 2000, 114 Stat. 2728, codified as 42 U.S.C. §§ 14135a(a)(2) and (d)(B), provide in pertinent part as follows:

> **(2) From individuals on release, parole, or probation**
>
> The probation office responsible for the supervision under Federal law of an individual on probation, parole, or supervised release shall collect a DNA sample from each such individual who is, or has

- 27 -

> been, convicted of a qualifying Federal offense (as
> determined under subsection (d)) . . . .
>
> . . . .
>
> **(d) Qualifying Federal offenses**
> . . . .
> **(B)** An offense relating to . . . sexual exploitation or
> other abuse of children (as described in chapter 110 of
> such title, sections 2251 through 2252) . . . .

42 U.S.C. §§ 14135a(a)(2) and (d)(B) (emphasis added).

These mandatory statutory provisions, passed in 2000, were not reflected in the Sentencing Guidelines until the November 2002 edition, which, as the statutes direct, make the collection of DNA samples a mandatory condition of supervised release. USSG §5D1.3(a)(8) (2002 ed.). Inexplicably, the briefs of both parties to this appeal proceed in large part on the assumption that the 2001 edition of the Guidelines apply to this condition, making the collection of DNA samples discretionary and thus subject to the conditions set out in USSG §5D1.3(b). See United States v. Walser, 275 F.3d 981, 987-88 (10th Cir. 2001), cert. denied, 535 U.S. 1069 (2002).

However, since statutes trump guidelines when the two conflict, United States v. Heckard, 238 F.3d 1222, 1237 (10th Cir. 2001), the statutory provisions set out above govern our resolution of Kimler's appeal on this issue.[13] Citing the

_____

[13]No *ex post facto* or any similar objection is raised in the briefs to the application of these statutes to Kimler. To the contrary, Kimler directs various

(continued...)

statute, the district court overruled Kimler's objections to the DNA condition of supervision. R. Vol. IV at 27; Order at 2, R. Vol. I, tab 52.

On appeal, Kimler argues first that § 14135a(d)(1)(B) is inapplicable since it is directed only at those who engage in the sexual exploitation or other abuse of children, and that his conduct did not amount to exploitation or abuse. Appellant's Br. at 25. He asserts the "Congress could not have intended such a broad interpretation to permit application of the DNA collection procedures to one convicted of simply having such depictions come through one's computer." Id. at 25-26.

We agree with the district court that the argument is resolved by the plain language of § 14135a(d)(1)(B) which expressly covers offenses under § 2252. Furthermore, the statutory language expansively refers to conduct "relating to" exploitation and abuse. The Supreme Court has made it clear that "[t]he distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children." New York v. Ferber, 458 U.S. 747, 759 (1982). "[T]he materials produced are a permanent record of the

---

[13](...continued)
arguments to § 14135a on other grounds, implicitly recognizing its applicability generally. And, § 14135a(2), by its terms, applies to any individual "who is or has been convicted of a qualifying Federal offense . . . ."

- 29 -

children's participation and <u>the harm to the child is exacerbated by their circulation</u>." <u>Id</u>. (emphasis added).

> [P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography.

<u>Id</u>. at 759 n. 10 (quotation omitted).

In a brief paragraph without supporting authority or a clear statement of his argument, Kimler next argues that the DNA Act is unconstitutional as an unreasonable, warrantless search under the Fourth Amendment. We disagree. The DNA Act, while implicating the Fourth Amendment, is a reasonable search and seizure under the special needs exception to the Fourth Amendment's warrant requirement because the desire to build a DNA database goes beyond the ordinary law enforcement need. <u>See</u>, <u>e.g.</u>, <u>Shaffer v. Saffle</u>, 148 F.3d 1180, 1181 (10th Cir. 1998); <u>Schlicher v. (NFN) Peters, I & I</u>, 103 F.3d 940, 943 (10th Cir.1996); <u>Boling v. Romer</u>, 101 F.3d 1336, 1340 (10th Cir. 1996); <u>Miller v. United States Parole Comm'n</u>, 2003 WL 1992428, at **7-10 (D. Kan. April 15, 2003); <u>United States v. Sczubelek</u>, 255 F. Supp. 2d 315, 319-23 (D. Del. 2003); <u>see also</u> <u>Roe v. Marquette</u>, 193 F.3d 72, 77-80 (2d Cir. 1999) (upholding Connecticut DNA

collection statute under "special needs" doctrine); but see United States v. Miles, 228 F. Supp. 2d 1130, 1135-38 (E.D. Ca. 2002).[14]

Kimler also briefly argues, without any supporting case authority, that the DNA Act violates the principle of separation of powers because Congress is ordering the judicial branch to impose a particular condition of supervised release. The argument is meritless.

Finally, both Kimler and the government address various arguments to whether or not DNA collection meets the Walser and related requirements for the imposition of discretionary conditions of supervision. As explained above, the mandatory nature of the governing statutes renders such a discussion irrelevant. However, reviewing for abuse of discretion, where appropriate, see United States v. Zanghi, 209 F.3d 1201, 1203 (10th Cir. 2000), and de novo with respect to the interpretation of the statutes and guidelines, see United States v. Archuletta, 231 F.3d 682, 684-85 (10th Cir. 2000) (guidelines), and United States v. Gigley, 213 F.3d 503, 505 (10th Cir. 2000) (statute), we hold, alternatively, that the district

---

[14]The Miles court found that the DNA Act is unconstitutional in light of the Supreme Court's decisions in City of Indianapolis v. Edmond, 531 U.S. 32 (2000), and Ferguson v. City of Charleston, 532 U.S. 67 (2001). The court noted that the DNA Act applies only to convicted felons, not free citizens, but found this to be a distinction without a difference. We disagree. As the Supreme Court recently noted, "[a] broad range of choices that might infringe constitutional rights in free society fall within the expected conditions . . . of those who have suffered a lawful conviction." McKune v. Lile, 536 U.S. 24, 36 (2002).

court did not err in finding that all the applicable conditions, including deterrence, are satisfied relative to the DNA collection requirement.  See Order at 2, R. Vol. I, tab 52.

### B.    Sex Offender Treatment Program

USSG § 5D1.3(d)(7) (2001 ed.) recommends the discretionary imposition of the following special condition of supervised release:

> (7)    Sex Offenses
>
>     If the instant offense of conviction is a sex offense, as defined in §5D1.2 (Term of Supervised Release) – a condition requiring the defendant to participate in a program approved by the United States Probation Office for the treatment and monitoring of sex offenders.

USSG § 5D1.3(d)(7) (emphasis added).

Application Note 1 to §5D1.2 defines a sex offense as "an offense, perpetrated against a minor, under . . . chapter 110 of [Title 18 of the United States Code], not including a recordkeeping offense."  USSG §5D1.2, comment. (n.1).  Section 2252 is part of chapter 110; therefore, offenses under 18 U.S.C. § 2252 are qualifying offenses for the "recommended" imposition of the condition that Kimler participate in a sex offender treatment program.

Kimler's contention that §5D1.3(d)(7) does not apply because he did not actually perpetrate an offense against a minor as the application note requires,

- 32 -

Appellant's Br. at 28, is meritless for the same reasons set out above relating to DNA collection.

As Kimler acknowledges, the district court ruled that "the child pornography offenses in this case were 'perpetrated against a minor' within the meaning of the guideline defining 'sex offense'." Order at 3, R. Vol. I, tab 52. That ruling and the imposition of the requirement that Kimler participate in a sex offender treatment program are not erroneous.

## CONCLUSION

For the aforementioned reasons, the Kimler's conviction and sentence are AFFIRMED.