**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 14 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

NOE ROSALES,

    Defendant-Appellant.

No. 04-5002

(D.C. No. 01-CR-4-C)
(N.D. Oklahoma)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **BRISCOE**, and **TYMKOVICH**, Circuit Judges.

Defendant Noe Rosales pled guilty to possession with intent to distribute

methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and was sentenced

to 168 months' imprisonment. In his initial direct appeal, this court remanded to the

district court for specific factual findings to support its conclusion that Rosales was an

organizer or leader under U.S.S.G. § 3B1.1. On remand, the district court set out its

findings and made no change to Rosales' sentence. Rosales now challenges the court's

determination that he was an organizer or leader for purposes of U.S.S.G. § 3B1.1(c). He

---

[*]This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

also contends the government breached the terms of the plea agreement. We exercise

jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

I.

In Rosales' initial direct appeal, we summarized the relevant background facts of

his case:

> Noe Rosales was part of a drug conspiracy operating in California, Utah, and Oklahoma which involved more than five individuals. The conspiracy operated from at least March 1996 to February 2001, although Rosales only pleaded guilty to participating in the conspiracy from December 2000 onward. Evidence in the record indicates that Rosales was second-in-command of the drug conspiracy, under his father's leadership. Although in at least one instance Rosales had to seek his father's final authorization for pricing, Rosales generally set prices for the drugs, directed subordinates, and negotiated with customers.
>
> In February 2001, Rosales personally authorized the sale of two pounds of methamphetamine in a recorded telephone conversation with a [confidential informant]. Prior to that, Rosales had negotiated with a Drug Enforcement Agency ("DEA") undercover agent and with the [confidential informant] for the sale of an additional 965.5 grams of methamphetamine.
>
> Rosales was indicted along with his co-conspirators for the unlawful distribution of methamphetamine and cocaine. Rosales entered into a plea agreement with the government in which the government stipulated that Rosales was a minor participant in the conspiracy. The plea agreement makes it clear, however, that the stipulation is not binding upon the sentencing court. Rosales pleaded guilty to one count of "Possession of a Controlled Dangerous Substance with Intent to Distribute" in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

United States v. Rosales, 80 Fed. Appx. 57, 59 (10th Cir. 2003) (Rosales I). At

sentencing, the district court determined Rosales was not a minor participant for purposes

of U.S.S.G. § 3B1.2, and denied his request for a downward adjustment. Instead, the

district court determined Rosales was an organizer or leader for purposes of § 3B1.1 and

2

increased his offense level by two points. The district court sentenced Rosales to 168 months' imprisonment, the lowest possible sentence under the applicable guideline range.

In his initial direct appeal, Rosales raised several sentencing issues, including two challenges to the district court's determinations regarding his role in the offense. Rosales asserted the district court erred in concluding he was not a minor participant under § 3B1.2. We disagreed, concluding a minor participant reduction was not warranted because Rosales "received a lower offense level by virtue of being convicted of an offense significantly less serious than warranted by his actual criminal conduct." Rosales I, 80 Fed. Appx. at 61. More specifically, we noted that "Rosales' plea agreement eliminated a 20-year minimum sentence and reduced his maximum sentence from life to 20 years." Id. Rosales also argued the district court erred in finding he was an organizer or leader under § 3B1.1(c), and in imposing a two-level upward adjustment. Because the district court failed to make specific findings on the record describing its basis for imposing the § 3B1.1(c) adjustment, we remanded for that purpose.

On remand, the district court issued written findings of fact, stating in pertinent part:

> The Court finds that the following facts, which were contained in the PSR and not disputed by any party, were proven and support its conclusion that Defendant exercised decision-making authority within the organization, acted as a manager and supervisor in the commission of the offense, had a high degree of participation in planning and organizing the offense and exercised a high degree of control and authority over others involved in the conspiracy:
> 1. In December 2000, Jorge Sanchez accompanied Defendant

to Tulsa to collect drug debts. They stayed at a hotel near Fourth Street and Lewis Avenue and collected $10,000 in approximately twenty days. They returned to Salt Lake City and on December 23, 2000, Defendant was arrested there on state drug charges.

2. In January 2001, Marcos Rosales [defendant's father] asked Jorge Sanchez to make another trip to Tulsa. Sanchez complained that he was not paid enough and Rosales agreed to pay Sanchez $500 per pound of delivered methamphetamine. On January 11, 2001, Sanchez went to Rosales' Utah residence where Marcos Rosales used a neoprene band to secure methamphetamine packets to Sanchez's mid-section. Defendant and Aurora Rosales [defendant's mother] were in the room when Sanchez was fitted with the neoprene band. Defendant accompanied Sanchez in a cab to the Salt Lake City airport. He gave Sanchez a telephone number for his Tulsa contact, Filberto Rosales. Defendant instructed Sanchez to get between $10,900 and $11,000 for the pound of methamphetamine.

3. Confidential sources informed federal investigators of the trip before Sanchez left Salt Lake City. Tulsa Police and Drug Enforcement Administration ("DEA") Agents set up surveillance at the Tulsa airport to await his arrival on the afternoon of January 11, 2001. These surveillance agents followed Sanchez to 1114 North Hilton Road in Sapulpa. Investigators had set up DEA Agent Eric Katz as a methamphetamine buyer in Tulsa. In preparation for a controlled buy, they arranged [for] two rooms at the La Quinta Inn, 10829 East 41st Street, to be set up with video and audio surveillance equipment. The room to be used for the "buy" had cameras and microphones installed inconspicuously and the second room held the agents who operated the recording equipment. In the early evening, Sanchez arrived at the hotel room and met with Agent Katz. He offered a pound of methamphetamine for sale but when weighed, the amount was somewhat less than a pound. Through an interpreter, Sanchez told Agent Katz the price was $10,900 but Agent Katz haggled over the price. During negotiations, Sanchez called Defendant to authorize a lower price. Agent Katz and Defendant negotiated on the telephone and finally agreed on $9,500 for the methamphetamine, which had a net weight of 423.8 grams. During the recorded conversation Defendant and Agent Katz negotiated the delivery of additional quantities of methamphetamine and crystal methamphetamine or "ice" from Utah to Tulsa, Oklahoma. Sanchez returned to Salt Lake City that night and gave

the money to Defendant. Sanchez was paid $500, which he wired to his family in Mexico.

4. On January 18, 2001, Agent Katz met with Pedro Arias-Garcia in Room No. 110 of the Howard Johnson Motel located at 4724 South Yale, Tulsa, Oklahoma. Arias produced three duct taped packages that had been driven from Utah to Tulsa, Oklahoma by Arias. The packages contained a pound of methamphetamine and a quarter-pound of crystal methamphetamine. When asked why he did not use commercial aircraft to travel to Tulsa, Arias stated that he had transported crystal methamphetamine and that if he had been caught with "crystal" he would have had "big fucking problems." Agent Katz told Arias that he had been given a price for the crystal methamphetamine from Defendant. Agent Katz advised Arias that the negotiated price for the crystal methamphetamine was $1,500 an ounce and the methamphetamine was $9,500 per pound. Arias made two telephone calls in an attempt to locate Marcos Rosales to verify the prices. A confidential source ("CS") present in the room was able to reach Defendant who stated that the pound of methamphetamine cost $10,500, but they would accept $9,500. Agent Katz handed Arias $5,000 and stated he would have the balance of $4,500 shortly. The crystal methamphetamine was advanced to Agent Katz in order to find a buyer. Arias stated that he would be leaving for Utah that evening and told Agent Katz to pay the balance to Sanchez, who would be arriving on February 1, 2001, with a quantity of cocaine. The d-Methamphetamine and Amphetamine had a net weight of 541.7 grams.

5. On February 6, 2001, Defendant, in a recorded telephone conversation, authorized the CS to sell two-pounds (907.2 grams) of methamphetamine for $8,500 per pound and advised the CS that he could keep $500 per pound as payment. The CS relayed to Defendant his pager number and Defendant told the CS that the code number for the transaction would be all sevens.

6. On February 6, 2001, the CS drove to Nanez's residence at 2206 South 133rd East Avenue, Tulsa, Oklahoma to deliver one pound of the two-pounds of methamphetamine Defendant authorized him to sell. The CS went into Nanez's garage as directed by Nanez. Once inside, Nanez advised he only wanted to purchase one ounce of methamphetamine. The CS replied he believed Nanez had requested one pound, not one ounce, of the drugs. Nanez explained that he never heard from his customer. After further negotiation, Nanez

5

agreed to purchase the entire amount of drugs, 597 gross grams, the CS had with him. Nanez agreed to pay half of the purchase price in addition to some cowboy boots up front and pay the remainder at a later date. Nanez placed the entire amount of drugs in a box. Then, he directed the CS to leave the residence because Nanez was expecting a customer to arrive at the house. Nanez directed the CS to wait at a local restaurant until Nanez telephoned him. That afternoon, Tulsa Police officers executed a search warrant at Jesus Nanez's residence. Officers recovered approximately 597 gross grams of methamphetamine from inside a cardboard box in the garage. Nanez was placed under arrest. During initial interviews with the officers, Nanez denied any knowledge of the methamphetamine found in his garage. A laboratory analysis was performed on the methamphetamine recovered during the search. It was determined that on February 6, 2001, Nanez possessed 539.3 net grams of methamphetamine.

7. On February 8, 2001, agents with the Salt Lake City, Utah, Drug Enforcement Administration conducted an undercover meeting with Defendant and Michael Jerome Donald, a.k.a. "Emmitt." The agents rented a room #355 at a Salt Lake City Holiday Inn hotel. At approximately 9:00 a.m., Agent Katz contacted Defendant by telephone and informed him that he was in room #355 of the hotel with a $3,000 payment for Defendant. The money was partial payment for approximately one-quarter pound of crystal methamphetamine delivered to the agent by Pedro Arias on January 18, 2001. Defendant advised that he was not in the area of the hotel and would send someone else to retrieve the payment.

8. Defendant arrived at the hotel room at approximately 9:15 p.m. and left twenty minutes later. At about midnight, Michael Jerome Donald arrived at the hotel room. He was allowed in by the undercover agents who handed him the $3,000. Donald counted the money and divided it into $500 stacks. One of the agents placed a telephone call to Defendant and handed the phone to Donald. Donald informed Defendant that the money was "straight." After the brief telephone conversation, Donald placed the money in his pocket and left the hotel room.

ROA I, Doc. 379 at 2-4. The district court made no change to Rosales' sentence.

II.

*Application of U.S.S.G. § 3B1.1(c)*

Rosales contends the district court erred in determining he was an organizer or leader for purposes of § 3B1.1(c). We review that determination for clear error. See United States v. Cruz Camacho, 137 F.3d 1220, 1223-24 (10th Cir. 1998) ("we believe the role of a defendant as a leader or organizer is among the sophisticated factual determinations a district court makes which depend upon an assessment of the broad context of the crime") (internal quotations omitted).

Section 3B1.1 of the Sentencing Guidelines provides varying "aggravating role" adjustments to a defendant's base offense level. In particular, subsection (c) requires that a defendant's offense level be increased "by 2 levels" if he "was an organizer, leader, manager, or supervisor in any criminal activity other than described in [subsections] (a) or (b)."

> To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

U.S.S.G. § 3B1.1, cmt. n.2.

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of

the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning and organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

Id., cmt. n.4.

In relatively small criminal enterprises that are not otherwise to be considered as extensive in scope or in planning or preparation, the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility. This is reflected in the inclusiveness of § 3B1.1(c).

Id., cmt. background.

Significantly, Rosales does not dispute the validity of any of the underlying factual findings set forth in the district court's written order on remand. Instead, Rosales challenges whether those findings support a determination that he was a leader or organizer for purposes of § 3B1.1(c). In particular, Rosales contends that none of the facts found and cited by the district court demonstrate that he "exercised command and control over others." Aplt. Reply Br. at 2. According to Rosales, the district court's factual findings demonstrate only that he "passed along orders to others from his father," and otherwise gave no orders himself. Aplt. Br. at 9. Further, Rosales asserts the district court's factual findings do not indicate that he independently established any drug prices.[1]

---

[1] At the original sentencing hearing, Rosales argued he did not qualify as an organizer or leader because (a) he did not have decision-making authority "with regard to setting the price of methamphetamine," ROA III at 10, (b) he "did not recruit any

8

The flaw in Rosales' arguments is that they focus exclusively on the "leader" role under § 3B1.1(c). As noted, however, a § 3B1.1(c) adjustment can be based on a defendant playing any one of four roles in the offense: "organizer, leader, manager, or supervisor." U.S.S.G. § 3B1.1(c); see United States v. Valdez-Arieta, 127 F.3d 1267, 1270-71 (10th Cir. 1997) (discussing distinction between "leading" and "organizing," and noting defendant can be subjected to adjustment under § 3B1.1 for performing either function in the commission of an offense). Thus, even if Rosales did not play a leadership role in the offense of conviction, he can still be subjected to an adjustment under § 3B1.1(c) if he played one of the other roles.

Having carefully examined the record on appeal, we conclude the district court's ultimate determination under § 3B1.1(c) was not clearly erroneous. The court's subsidiary factual findings clearly indicate that Rosales played an organizational role in the offense by coordinating and overseeing methamphetamine transactions. See Valdez-Arieta, 127 F.3d at 1272 ("a defendant may be punished as an organizer under § 3B1.1(c) for . . . coordinating and overseeing the implementation of the conspiracy even though the defendant may not have any hierarchical control over the other participants"). For example, as outlined in paragraph 2 of the district court's subsidiary factual findings, it was uncontroverted that Rosales helped make arrangements for another person, Jorge

accomplices," id., and (c) did not claim "a greater share of money or drugs because of an elevated position," id. at 11.

9

Sanchez, to transport methamphetamine from Salt Lake City to Tulsa to complete a sales transaction. More specifically, Rosales accompanied Sanchez in a cab to the Salt Lake City airport, gave him "a telephone number for his Tulsa contact," and instructed him as to the amount "to get" for the methamphetamine. ROA I, Doc. 379 at 2. Likewise, as outlined in paragraphs 3, 7, and 8 of the findings, it was uncontroverted that Rosales arranged for delivery of methamphetamine to a buyer, and subsequently arranged for collection of proceeds from the buyer (in each instance someone other than Rosales actually performed the task). In addition to acting as an organizer, it is apparent that Rosales also played a supervisory role. In particular, it is uncontroverted that Rosales oversaw the activities of couriers who delivered methamphetamine from Salt Lake City to Tulsa and, in turn, oversaw the collection of proceeds from buyers. In addition, it was uncontroverted that Rosales oversaw negotiations between couriers and buyers, assisting in determining prices for the methamphetamine.

Thus, even though Rosales' father may have been the true "leader" in the drug organization, we agree with the district court that Rosales acted as an organizer or leader in the offense, and therefore was properly subjected to a 2-level increase pursuant to § 3B1.1(c).

*Breach of plea agreement*

Rosales contends the government breached the terms of the plea agreement by arguing before this court in Rosales I that the district court acted properly in applying a 2-

10

level adjustment under § 3B1.1(c) due to Rosales' role as an organizer or leader. Although the plea agreement makes no mention of § 3B1.1(c), Rosales argues that, in light of the government's stipulation that he was entitled to a minor participant adjustment under § 3B1.2(b), it was reasonable to expect the government "to refrain from arguing the exact opposite," i.e., "that he deserved a two-level upward adjustment under . . . § 3B1.1 ."  Aplt. Br. at 13.

We conclude it is unnecessary to address this issue.  Under the express terms of the plea agreement, the only remedy available to Rosales is withdrawal of his guilty plea.  See ROA I, Doc. 200 at 9 ("In the event either party believes the other has failed to fulfill any obligations under this agreement, then the complaining party shall, in its discretion, have the option of petitioning the Court to be relieved of its obligations herein."); see also United States v. Berger, 251 F.3d 894, 909-10 (10th Cir. 2001) (indicating, in case involving identical plea agreement language, that "the appropriate remedy" was to give defendant "an opportunity to withdraw from the agreement").  However, it is clear from Rosales' appellate pleadings, as well as his counsel's statements at oral argument, that he does not seek that remedy (a review of the record demonstrates why – he was allowed to plead guilty to a substantially lesser offense than the one originally charged).  Absent a request by Rosales to withdraw his guilty plea, it would be a pointless exercise for us to determine whether the government's actions violated the terms of the plea agreement.

*Supplemental authority - Blakely v. Washington*

11

Approximately two weeks before oral argument, Rosales submitted a letter to the court pursuant to Federal Rule of Appellate Procedure 28(j) citing the Supreme Court's recent decision in <u>Blakely v. Washington</u>, 124 S. Ct. 2531 (2004). Assuming Rosales' letter is intended to raise a new issue, i.e., that he had a Sixth Amendment right to a jury trial on his federal sentencing enhancements, we reject the issue. <u>See</u> <u>United States v. Kimler</u>, 335 F.3d 1132, 1138 n.6 (10th Cir. 2003) (refusing to address issue asserted for first time in supplemental authority letter filed pursuant to Rule 28(j)); <u>see</u> <u>also</u> <u>United States v. Levy</u>, 379 F.3d 1241, 1242-44 (11th Cir. 2004) (refusing to entertain <u>Blakely</u>-based argument raised for first time in appellant's petition for rehearing); <u>id.</u> at 1244 (concluding language of Rule 28(j) "underscores that an appellant's supplemental authority must relate to an issue previously raised in a proper fashion, and that an appellant cannot raise a wholly new issue in a supplemental authority letter or brief").

The judgment of the district court is AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

12